NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

10th Circuit Court – Derry Family Division
Nos.  2013-403
      2013-445
      2013-593


IN RE GUARDIANSHIP OF MADELYN B.

Argued:  April 3, 2014
Opinion Issued:  July 2, 2014

Gay & Lesbian Advocates & Defenders, of Boston, Massachusetts (Janson Wu on the brief and orally), and Crusco Law Office, PLLC, of Bedford (Kysa Crusco on the brief), for the appellant, Susan B.

Law Office of Joshua L. Gordon, of Concord (Joshua L. Gordon on the brief and orally), for the appellee, Melissa D.

Upton & Hatfield, LLP, of Concord (Marilyn Billings McNamara on the brief), for Susan Frelich Appleton & a., as amici curiae.

Pierce Atwood, LLP, of Portsmouth (Lawrence M. Edelman and Michele E. Kenney on the brief), and Lambda Legal Defense and Education Fund, Inc., of New York, New York (Karen L. Loewy on the brief), for American Academy of

Assisted Reproductive Technology Attorneys, American Fertility Association, Reproductive Science Center of New England, New Hampshire Civil Liberties Union, COLAGE, Family Equality Council, Human Rights Campaign, Lambda Legal Defense and Education Fund, Inc., National Center for Lesbian Rights, and National Gay and Lesbian Task Force, as amici curiae.


HICKS, J.  The appellant, Susan B., appeals orders of the 10th Circuit Court – Derry Family Division (Sadler, J.) that:  (1) terminated her guardianship over the person of Madelyn B., a child; (2) dismissed her verified parenting petition; and (3) denied her motion to intervene in adoption proceedings involving Madelyn B.  The appellee, Melissa D., is Madelyn B.'s biological mother.  We reverse in part, vacate in part, and remand.

Susan's pleadings allege, in part, the following:  She and Melissa met in 1997 and soon became romantically involved.  They held a commitment ceremony on August 16, 1998, and "considered [them]selves to be as fully committed to one another as any married couple."  Melissa took Susan's last name as her own.  We note that, at that time, same-sex marriage was prohibited in New Hampshire, and did not become legal until 2010.  Compare RSA 457:1, :2 (1992) (amended 2009) with RSA 457:1, :1-a, :2 (Supp. 2013).

Susan and Melissa intended to raise a family together, and they jointly bought a house in which to raise their family.  When Melissa sought to become pregnant using an anonymous sperm donor, they searched for a donor who shared Susan's Irish heritage.  After the initial course of fertility treatments failed, Susan sought insurance coverage for another course of treatments.  Melissa became pregnant and, in 2002, gave birth to Madelyn.  Susan and Melissa decided to give Madelyn Susan's middle and last names.

Susan and Melissa were both named as Madelyn's parents in the birth announcements sent to friends and family and printed in the local newspaper, as well as in a "dedication ceremony" held in the Unitarian Universalist Church when Madelyn was a year old.  Susan was listed as Madelyn's parent in her preschool documents and in her medical records.  Susan was involved in the daily care of Madelyn, and Susan and Melissa jointly made all decisions involved in raising Madelyn, including decisions regarding health care, education, and religion.

An attorney for Susan and Melissa advised them that Susan could not legally adopt Madelyn, and that "a guardianship was the best available option to protect [Susan's] parental relationship with her."  Susan was appointed Madelyn's guardian on March 15, 2002.  Melissa also amended her will to

2

appoint Susan as Madelyn's guardian should Melissa die while Madelyn was a minor.

In November 2008, when Madelyn was six years old, Susan and Melissa's relationship ended. Melissa and Madelyn moved in with Eugene D., who Melissa later married. Susan and Melissa agreed upon a schedule for regular visitation. Susan saw Madelyn every weekend, had overnight visits every other week, and continued to be actively involved in Madelyn's life. Susan paid weekly child support and, in addition, helped with the cost of Madelyn's extracurricular activities. She also provided Madelyn with food, clothing, and gifts.

In February 2013, Melissa stopped cashing Susan's child support checks. Susan avers that she nevertheless continued to send them. On March 2, 2013, when Susan attempted to pick up Madelyn for her weekly visitation, she was informed that Madelyn no longer wanted a relationship with her. At a meeting the two had later to discuss the situation, Melissa "claimed that [Madelyn] no longer wanted to see Susan." Melissa did not return Susan's subsequent phone calls, and Susan was unable to contact Madelyn directly through online social media because Madelyn's settings had been changed.

On April 2, 2013, Melissa filed a motion to terminate Susan's guardianship over Madelyn, asserting that the guardianship was "no longer necessary because Madelyn no longer wishes to have a relationship with Susan." On April 4, Melissa filed an ex parte emergency motion to terminate the guardianship alleging that Susan had been "showing up at Madelyn's school, contacting family members and behaving in such a way that both Madelyn and [Melissa] fear [for Madelyn's] safety." The court suspended the guardianship that day "pending response to [r]equest to terminate . . . and subsequent order," and ordered "[n]o hearing to be scheduled pending further order." Susan, representing herself, filed an objection on April 5. On April 12, the court terminated the guardianship on the grounds that it was "no longer necessary to provide for Madelyn's essential physical and safety needs and termination would not adversely affect Madelyn psychologically." The court found that the guardianship had been created to give Susan the "right and duty" to care for Madelyn if Melissa were not available to do so. It further found that following the termination of Susan and Melissa's relationship and Melissa's subsequent marriage, Melissa's "husband is the logical choice to care for Madelyn in Melissa's absence as they are now the family unit."

On April 18, Susan, represented by counsel, moved for an immediate hearing. Melissa objected, noting, "We have begun the process of my husband, Madelyn[']s stepfather, adopting her." The court denied the motion and Susan's subsequent motion to reconsider.

3

On April 29, 2013, Susan moved to intervene in the pending adoption proceeding. On the same day, she filed a verified parenting petition seeking temporary and final orders on child support and a parenting plan, as well as a determination that she "is a legal parent to," or "stands in loco parentis to[,] Madelyn." The court denied the motion to intervene, and dismissed Susan's verified parenting petition, finding that she "is not [a] parent." (Quotation and bolding omitted.) The court denied Susan's subsequent motion for reconsideration of the order denying her motion to intervene and for an order "providing [her] with notice and the right to request a hearing to prove her legal parentage of Madelyn."

On appeal, Susan argues, in part, that the family division erred by: (1) terminating the guardianship without a hearing or opportunity to conduct discovery; (2) ruling that the legal standard for termination of a guardianship had been satisfied; (3) dismissing her parenting petition; and (4) denying her motion to intervene in the adoption case. Melissa counters that the guardianship was created to allow Susan to provide health insurance for Madelyn and to further "the daily practicalities of child-rearing." She argues that since "Madelyn's sustenance is being adequately met by her new family," the guardianship is no longer necessary.

We first address Susan's parenting petition claim because it is dispositive of her other claims at this stage of the proceedings. Susan characterizes the trial court's sua sponte dismissal of her verified parenting petition as a dismissal for failure to state a claim upon which relief can be granted. See Kennedy v. Titcomb, 131 N.H. 399, 402 (1989) (noting that "[a] trial court has the discretion to dismiss an action sua sponte where the allegations contained in a writ do not state a claim upon which relief can be granted"). In essence, the trial court ruled that Susan's petition failed to state a claim on any of her asserted bases for claiming to be a parent of Madelyn. Cf. In the Matter of J.B. & J.G., 157 N.H. 577, 580 (2008) (holding that petitioner could maintain his action seeking "parental rights and responsibilities under RSA chapter 461-A," notwithstanding his lack of biological relationship to the child, "so long as he alleges sufficient facts to establish his status as a parent by other means").

"[I]n reviewing the trial court's order of dismissal [for failure to state a claim], [we] must determine whether the plaintiff's writ contains facts which are sufficient to constitute a cause of action. [We] must rigorously scrutinize the complaint to determine whether, on its face, it asserts a cause of action." Kennedy, 131 N.H. at 401 (quotation and citation omitted). "[W]e assume the truth of the facts alleged by the plaintiff and construe all reasonable inferences in the light most favorable to the plaintiff." Farm Family Cas. Ins. Co. v. Town of Rollinsford, 155 N.H. 669, 670 (2007).

4

Susan first argues that the family division erred in dismissing her parenting petition because she sufficiently alleged a claim under RSA 168-B:3, I(d)'s "holding out" provision.  See RSA 168-B:3, I(d) (2002).  Because this argument raises an issue of statutory interpretation, our review is de novo.  See Town of Newbury v. N.H. Fish & Game Dep't, 165 N.H. 142, 144 (2013).

> We are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole.  When examining the language of the statute, we ascribe the plain and ordinary meaning to the words used.  We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include.  We also interpret a statute in the context of the overall statutory scheme and not in isolation.

Id. (quotations and citations omitted).

> RSA 168-B:3, I, provides, in relevant part:
>
> I.  Notwithstanding any other provision of law, a man is presumed to be the father of a child if:
>
> . . .
>
> (d)  While the child is under the age of majority, he receives the child into his home and openly holds out the child as his child.

RSA 168-B:3, I (2002).  Susan asserts that "[a]lthough the statute uses 'father' and male pronouns, this Court must construe the holding out provision to apply to mothers as well, in accordance with statutory rules of construction, the original intent and purpose of the statute, and constitutional guarantees of equal protection."

The legislature has instructed that in construing all statutes, "words importing the masculine gender may extend and be applied to females," RSA 21:3 (2012), "unless such construction would be inconsistent with the manifest intent of the legislature or repugnant to the context of the same statute," RSA 21:1 (2012).  We have previously declined to employ that instruction as liberally as is urged here.  In Chretien v. Company, 87 N.H. 378 (1935), we held that "a statute requiring that words denoting the masculine gender shall include females will not authorize us to read the word widow as including widower."  Chretien, 87 N.H. at 379 (quotation omitted); cf. id. at 378-79 (noting also, however, that the statutory instruction to construe masculine terms to include women would allow the words "'workman' and 'his'" to include

a female worker).  In reaching that conclusion, we noted, after surveying similar cases from other jurisdictions, that "[n]o case has been found where so liberal a construction has been adopted as would supply 'widower' for 'widow.'" Id. at 380.

By contrast, other jurisdictions have interpreted the terms "paternity" and "father" to apply to women.  In Rubano v. DiCenzo, 759 A.2d 959 (R.I. 2000), for instance, the Supreme Court of Rhode Island noted:

> While the word "paternity" implies the "fathering" of a child, we are mindful of the Legislature's instruction that when statutes are construed "[e]very word importing the masculine gender only, may be construed to extend to and to include females as well as males." Thus, two women may certainly be "adults who shall be involved with paternity" of a child for purposes of this statute.

Rubano, 759 A.2d at 970 n.13 (citation omitted) (interpreting statute granting family court jurisdiction over matters relating to adults involved with paternity of children born out of wedlock to apply to dispute between same-sex partners over visitation with child conceived by one, according to agreement between them, through artificial insemination).

Susan correctly notes that courts in other jurisdictions have applied the particular paternity presumption she asserts — the "holding out provision" — equally to mothers.  See, e.g., Chatterjee v. King, 280 P.3d 283, 293 (N.M. 2012).  We note that those jurisdictions had statutory provisions, more specific than ours, instructing that their paternity "presumptions are to be read in a gender-neutral manner insofar as practicable in an action to determine . . . the existence of a mother and child relationship."  Frazier v. Goudschaal, 295 P.3d 542, 559 (Kan. 2013) (Biles, J., concurring in part) (quotation omitted); see Elisa B. v. Superior Court, 117 P.3d 660, 665 (Cal. 2005) (holding that woman was presumed mother under Uniform Parentage Act's (UPA) provision presuming paternity based upon receiving the child into one's home and holding out child as one's own where UPA "expressly provides that in determining the existence of a mother and child relationship, insofar as practicable, the provisions of this part applicable to the father and child relationship apply" (quotation and brackets omitted)); In re S.N.V., 284 P.3d 147, 151 (Colo. Ct. App. 2011) (interpreting presumptive paternity provision of the UPA, in light of its statutory construction provisions, so that "[a] woman's proof of marriage to the child's father, or her proof of receiving the child into her home and holding the child out as her own, . . . may establish the mother-child relationship"); Chatterjee, 280 P.3d at 287.

We find these cases instructive, not only for our application of RSA 21:3, but also for our application of other canons of statutory construction.  One

such canon recognizes that "[o]ur goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme."  Sheehan v. N.H. Dep't of Resources & Economic Dev., 164 N.H. 365, 368 (2012).  RSA 168-B:3 is contained within a chapter entitled "Surrogacy."  See RSA ch. 168-B (2002).  The chapter's statement of purpose provides that "[t]he purpose of this act is to establish consistent state standards and procedural safeguards for the protection of all parties, and to determine the legal status of children born as a result of [surrogacy] arrangements."  Laws 1990, 87:1, II.  Specifically, the Legislature noted that the chapter ensures, among other things, that "the resulting child's status is legally certain in order that the child not be the chief remedial focus of litigation; and that adequate support be assured for the resulting child."  Id.  In furtherance of the chapter's stated purpose, RSA 168-B:7 provides:  "If, under the provisions of this chapter, a parent-child relationship is created between 2 persons, the child shall be considered, for all purposes of law, the legitimate child of the parent."  Further, RSA 168-B:8 declares that "[a]ny person who is determined to be the parent of a child under the provisions of RSA 168-B:2-5 shall support the child."  RSA 168-B:8, I.

In addition, the chapter indicates an implicit legislative preference for the recognition of two parents.  See, e.g., RSA 168-B:2 (mother-child relationship), :3 (father-child relationship).  "By recognizing the value of determining paternity, the Legislature implicitly recognized the value of having two parents, rather than one, as a source of both emotional and financial support, especially when the obligation to support the child would otherwise fall to the public."  Elisa B., 117 P.3d at 669; cf. In the Matter of Gendron & Plaistek, 157 N.H. 314, 321 (2008) (noting, in the context of paternity determinations, that "stability and continuity of support, both emotional and financial, are essential to a child's welfare" (quotation omitted)); RSA 461-A:2, I (Supp. 2013) (stating as premise of statutory policy that "children do best when both parents have a stable and meaningful involvement in their lives").  The Chatterjee court similarly noted:

> [T]he state has a strong interest in ensuring that a child will be cared for, financially and otherwise, by two parents.  If that care is lacking, the state will ultimately assume the responsibility of caring for the child.  This is one of the primary reasons that the original UPA was created, and it makes little sense to read the statute without keeping this overarching legislative goal in mind.

Chatterjee, 280 P.3d at 292 (citation omitted).

The policy goals of ensuring legitimacy and support would be thwarted if our interpretation of RSA 168-B:3 failed to recognize that a child's second parent under that statute can be a woman.  Cf. id. at 287-88 (noting that

"[b]ecause the [UPA's holding out] presumption is based on a person's conduct, not a biological connection," it "is reasonably capable of being accomplished by either a man or a woman"). Without that recognition, a child in a situation similar to Madelyn's could be entitled to support from, and be the legitimate child of, only her birth mother. See RSA 168-B:2, :7, :8. Two adults — Melissa and Susan — intentionally brought Madelyn into the world and held her out as their child; we cannot read RSA 168-B:3 so narrowly as to deny Madelyn the legitimacy of her parentage by, and her entitlement to support from, both of them. Cf. In re Jessica W., 122 N.H. 1052, 1056-57 (1982) (interpreting adoption statute liberally, "in accordance with the legislative intent to protect, not injure, adopted children," to allow unwed natural parents to utilize the stepparent exception to the general rule that "adoption severs the rights of the natural parent(s)," so that their child would "not have to be deprived of its relationship with its mother in order to be legitimized by its natural father through the adoption process"). We note that the intention of Melissa's husband to adopt Madelyn does not alter our view.

Consistent with the above-noted policy goals is the recognition that "[t]he paternity presumptions are driven, not by biological paternity, but by the state's interest in the welfare of the child and the integrity of the family." In re Salvador M., 4 Cal. Rptr. 3d 705, 708 (Ct. App. 2003). "The familial relationship between a nonbiological [parent] and an older child [over two years of age], resulting from years of living together in a purported parent/child relationship, is considerably more palpable than the biological relationship of actual paternity and should not be lightly dissolved." Id. (quotations omitted); cf. Roberts v. Ward, 126 N.H. 388, 392-93 (1985) (noting that "[p]sychiatrists and psychologists unanimously counsel that children should maintain and retain meaningful relationships and that to deny them continuing contacts is a deprivation" (quotation and ellipses omitted)).

Accordingly, in some cases, we have refused to allow a presumption of paternity to be rebutted by proof of biological paternity. In Watts v. Watts, 115 N.H. 186 (1975), for instance, we affirmed the denial of a divorcing husband's request for blood tests to dispute the paternity of children of the marriage. Watts, 115 N.H. at 189. We held that although, in general, common law and statutory paternity presumptions may be rebutted by blood tests, "those rules do not apply . . . where defendant has acknowledged the children as his own without challenge for over fifteen years." Id. Similarly, we have allowed a determination of paternity to stand despite a confirmed lack of biological connection. Thus, in In the Matter of J.B. & J.G., we held that the petitioner — who was listed as the father on the child's birth certificate, had filed an affidavit of paternity, had a child support order entered against him, and had "consistently maintained contact with the child" — had "standing to seek full parental rights and responsibilities under RSA chapter 461-A" notwithstanding that paternity testing had confirmed he was not the child's biological father. In

8

the Matter of J.B. & J.G., 157 N.H. at 578, 581. We rejected the contention of the respondent, the child's biological mother, that the petitioner could not be a "parent" under RSA chapter 461-A because he did not meet the dictionary definition of "one that begets or brings forth offspring." Id. at 580. We reasoned:

> After considering the overarching statutory scheme in this area, as we must, we observe that the legislature has set forth too many alternative routes to establish parental status that do not require proof of biological ties for us to give the respondent's argument much weight. The petitioner's lack of a biological connection to [the child] is therefore not fatal to his request for parental rights and responsibilities under RSA chapter 461-A, so long as he alleges sufficient facts to establish his status as a parent by other means.

Id. (citations omitted). Accordingly, we conclude that the lack of a biological connection between Susan and Madelyn is not a bar to application of the holding out presumption.

Given our construction of RSA 168-B:3, I (d), we need not address Susan's constitutional arguments. See Olson v. Town of Fitzwilliam, 142 N.H. 339, 345 (1997) (noting that we decide cases on constitutional grounds only when necessary).

For all of the foregoing reasons, we hold that RSA 168-B:3, I(d) applies equally to women and men. We must now determine whether Susan has alleged sufficient facts to state a claim under that statute. We conclude that she has.

Assuming the truth of Susan's alleged facts, and construing all reasonable inferences in the light most favorable to her, Farm Family Cas. Ins. Co., 155 N.H. at 670, we conclude that she adequately pleaded that she received Madelyn into her home and openly held Madelyn out as her child. She and Melissa planned to have and raise children together. They prepared Madelyn's nursery together in the home they had jointly purchased because they "thought it would be a good place to raise a family." When Madelyn was born, Susan was in the delivery room. She alleges: "From the very beginning, Maddie, Melissa, and I were a family. Melissa was the 'Mommy,' and I was the 'Momma.' Together we were . . . Maddie's parents, and Maddie was our daughter. I loved Maddie as my daughter, treated her as my daughter, and saw her as my daughter."

Susan's allegations, taken as true, indicate that Melissa also regarded Susan as Madelyn's parent as evidenced by, among other things, giving Susan

9

a greeting card commemorating the "Birth of Our Baby," and including her as "Momma," and her parents as Madelyn's grandparents, on Madelyn's family tree. The allegations also indicate that Susan appeared "to the world" to be Madelyn's parent. Madelyn shares Susan's last name. Susan was named as a parent, along with Melissa, in birth announcements and in a church ceremony. Susan was named as a parent in Madelyn's school and medical records, and was treated as a parent at Madelyn's preschool.

Taking Susan's allegations as true and drawing all reasonable inferences in her favor, we hold that she has stated a claim for presumed parentage under RSA 168-B:3, I(d). Cf. Elisa B., 117 P.3d at 670 (holding birth mother's same-sex partner was "a presumed mother . . . because she received the children into her home and openly held them out as her natural children"); Chatterjee, 280 P.3d at 296 (holding same-sex partner of adoptive mother asserted sufficient facts to give her standing to establish parentage "because her allegations satisfy the [statutory] hold out provision"). Accordingly, we reverse the family division's dismissal of Susan's verified parenting petition and remand. We direct the family division to schedule a prompt hearing on Susan's request for temporary orders. In light of our holding regarding Susan's parentage claim based upon the statutory holding out provision, we need not address her other asserted bases of parental rights, and we express no opinion with respect to them.

Consequently, we also vacate the family division's denial of Susan's motion to intervene in the adoption proceedings and stay those proceedings until the issue of Susan's parentage of Madelyn is finally determined.

Similarly, we vacate the family division's termination of Susan's guardianship over Madelyn and stay those proceedings until the issue of Susan's parentage of Madelyn is finally determined.

Reversed in part; vacated in part; and remanded.

DALIANIS, C.J., and CONBOY, LYNN, and BASSETT, JJ., concurred.