ROBINSON, J.
¶ 1. This is the third case in the last decade that has called upon this Court to determine whether an individual who is not biologically related to a child, has not legally adopted the child, and is not married to the child's legal parent may be the child's legal parent. In the absence of guidance from the Legislature on this question, this Court must continue to resolve these cases as they arise, relying on the sparse guidance the Legislature has given us, our past decisions, and national trends. The family division dismissed plaintiff's petition to establish parentage of the two children legally adopted by her domestic partner, concluding that the definition of "parent" in the Vermont parentage statute does not extend to those who are not connected by biology or adoption to the child, or by marriage or civil union to the child's legally recognized parent. We conclude that plaintiff's allegations are sufficient to withstand dismissal with respect to the younger child, M.P., insofar as plaintiff has alleged that she and defendant mutually agreed to bring M.P. into their family and to raise her together as equal co-parents, and have in fact done so for many years. Accordingly, we affirm the dismissal as to G.P., and reverse as to M.P., and remand for further proceedings.
¶ 2. We review a decision to dismiss for lack of jurisdiction without deference, "with all uncontroverted factual allegations of the complaint accepted as true and construed in the light most favorable to the nonmoving party." Jordan v. State, Agency of Transp., 166 Vt. 509, 511, 702 A.2d 58, 60 (1997). The question before the Court at this juncture is not whether plaintiff is entitled to custody or even legal recognition as a parent. The only question before us now is whether, assuming the facts alleged in the complaint to be true, "it appears beyond doubt that there exist no circumstances or facts which the plaintiff could prove about the claim made in [the] complaint which would entitle [plaintiff] to relief." Parker v. Town of Milton, 169 Vt. 74, 79, 726 A.2d 477, 481 (1998) (quotation omitted).
¶ 3. Plaintiff alleged the following facts, which we accept as true for the purposes of evaluating the trial court's dismissal of her parentage action. Plaintiff and defendant were in a relationship from 2003 to 2010. They lived together, shared meals, vacationed together, and cared for each others' aging parents. When their relationship began, defendant was the adoptive mother of a one-year-old child, G.P. The parties raised G.P. as an intact family. From the time she could talk, G.P. referred to plaintiff as "Mom," or "Mama."
*562 Defendant encouraged G.P. to call plaintiff "Mama," and referred to plaintiff as "Mama" in the child's presence.
¶ 4. When G.P. was two years old, the parties jointly decided to adopt another child together. They had extensive discussions about whether to pursue a domestic adoption or to adopt another child from Guatemala, where G.P. was born. They ultimately decided to adopt a child from Guatemala because they thought the children should have a common shared heritage. They began working with an agency that would facilitate their adoption as a same-sex couple. Because of concerns about the timing of the adoption and the possibility that Guatemala was going to close off its adoption process, they jointly decided that defendant would initiate the formal adoption because she had been through the process before. After they learned that the agency they had begun working with as a couple was going to take significantly longer than expected and they would only be able to adopt an older child rather than a baby, the parties decided to switch to the agency defendant had used when she adopted G.P. That agency did not allow same-sex adoptions. Defendant worked with the agency as the adoptive parent. On two occasions, plaintiff stayed home with G.P. while defendant traveled to Guatemala to visit the proposed adoptive child, M.P.; on two other occasions, plaintiff, defendant, and G.P. all traveled to Guatemala together to spend time with M.P. M.P. came home to Vermont in February 2006, when she was almost six months old.
¶ 5. Plaintiff fulfilled the role of a parent to the children in every aspect: she took maternity leave to be the primary caretaker of the children after M.P.'s adoption, and when she went back to work part-time, she took M.P. with her; the children called her "Mom," and defendant referred to her as the children's mother to friends, teachers, doctors, family, and acquaintances; she was part of medical decisionmaking; and she took care of the children's daily needs, including bathing them, putting them to sleep, and taking them to the doctor. Because she had more flexible work hours than defendant, plaintiff took the primary parenting role in the children's lives.
¶ 6. The parties intended to enter into a civil union and go through a legal second-parent adoption, but a series of life complications, ranging from the illness and death of defendant's parents to defendant's frequent travel to Washington D.C. to care for an ill friend to plaintiff's then-undiagnosed Lyme disease, prevented the parties from entering into a civil union or completing a second-parent adoption of the children.
¶ 7. In 2010, when the parties' relationship ended, they created a shared custody agreement providing for each parent to have the children half of the time. Both parents supported the children financially. The parties never filed this custody agreement with any court, but did communicate it to the children's school. The parties attended family counseling to work on their co-parenting and implement a schedule.
¶ 8. The parties acted in accordance with the agreement until 2013, when defendant began disrupting the contact schedule. Defendant told the school not to contact plaintiff about the children and prevented the children from seeing plaintiff, sometimes for weeks at a time. Despite the disruptions in the schedule, plaintiff has maintained a strong bond with the children. They text and talk to each other and see each other when defendant allows. M.P. has communicated that she loves and misses plaintiff, but that defendant will call the police if she emails plaintiff again. The *563 disruption has been harmful to the children.
¶ 9. On August 21, 2015, plaintiff filed a petition in the family division pursuant to 15 V.S.A. §§ 301 - 308 to establish parentage, in which she claimed to be the "de facto and intended mother of the children." On September 30, the family division, on its own initiative, dismissed plaintiff's case because it concluded that it lacked jurisdiction. Relying on our decisions in Titchenal v. Dexter, 166 Vt. 373, 693 A.2d 682 (1997), and Moreau v. Sylvester, 2014 VT 31, 196 Vt. 183, 95 A.3d 416, the family division noted that this Court has "declined to expand the definition of 'parent' in cases of so-called 'third-party parents' where there has been no adoption, marriage, or civil union." The court noted that plaintiff is "apparently seeking a legal remedy," in contrast to the equitable remedies sought in Moreau and Titchenal , but concluded there was no jurisdiction over the case, given this Court's unwillingness "to open parentage actions to third parties in [plaintiff's] position." Plaintiff appealed. Defendant did not file a brief, and the Court has no record of defendant's position as to plaintiff's parental status. The National Center for Lesbian Rights has filed a brief as amicus curiae in support of plaintiff's position.
¶ 10. On appeal, plaintiff argues that she is entitled to pursue an action for parentage, as the family division has jurisdiction over her claim and she has standing as a parent under 15 V.S.A. § 302 to bring a parentage action. Furthermore, plaintiff argues that Vermont law and the U.S. Constitution require the Parentage Act to be interpreted to allow the nonmarital partner of an adoptive parent to seek parental rights and responsibilities, and that the ability of a nonmarital couple to jointly adopt should not preclude the nonadoptive parent from establishing parentage through the statute.
¶ 11. We conclude that the family division erred in dismissing this case. This Court's past decisions with respect to the definition of "parent," and access to the rights and responsibilities that come from that status, have created a legal framework in which parental status is viewed in the absence of a marriage, civil union, or biological or adoptive relationship with the child in a narrow class of cases in which the parents intended to bring a child into their family and raise the child together, and in fact did so.[1] This approach is not only consistent with our caselaw concerning parental rights, but it also furthers the core purpose of Vermont's statutes relating to parent-child relationships, which is promoting the welfare of children, and it is supported by the weight of persuasive authority on this issue. Applying this framework to this case, we conclude that plaintiff pled sufficient facts to survive a motion to dismiss, and is entitled to the opportunity to prove her claims as they relate to the younger child, M.P., but not the older child, G.P. We continue to urge the Legislature to act in this area, but in the absence of legislative guidance, we must resolve these cases as they arise, relying on our past decisions and persuasive authority from other jurisdictions. For these reasons, we affirm the court's dismissal of petitioner's claims with respect to G.P. and reverse the family division's dismissal of *564 this case with respect to M.P. and remand for further proceedings in accordance with this opinion.
I. Our Existing Case Law
¶ 12. Four prior decisions of this Court set the stage for this case: In re B.L.V.B., 160 Vt. 368, 628 A.2d 1271 (1993), Titchenal, 166 Vt. 373, 693 A.2d 682, Miller-Jenkins v. Miller-Jenkins, 2006 VT 78, 180 Vt. 441, 912 A.2d 951, and Moreau, 2014 VT 31, 196 Vt. 183, 95 A.3d 416. Together, these cases support the proposition that in a narrow class of cases in which there is no competing claimant, parental status can flow from the mutual agreement and actions of the established legal parent and a putative second parent even in the absence of a marriage or a civil union between the parents or a biological connection between putative parent and child.
¶ 13. In In re B.L.V.B., 160 Vt. 368, 628 A.2d 1271, this Court first recognized that in certain cases a legal status between parent and child may arise from the mutual agreement and joint conduct of the child's legally recognized parent and the intended second parent even without a connection through marriage or biology. In that decision, the Court also recognized the Legislature's intent that statutes concerning parent and child be construed in a way that promotes the welfare of children. In these ways, the Court laid a critical foundation for its developing understanding of parenthood.
¶ 14. Deborah, the petitioner in In re B.L.V.B., and her partner Jane were in a committed relationship. They decided that Jane would bear children conceived with sperm from an anonymous donor, and they would raise the children together. They had two children. Deborah assisted at the births, and she and Jane were equally responsible for raising and parenting both children. Vermont's adoption laws at the time provided that when a person adopts a child, the parental rights of prior parents were extinguished, except "when the adoption is made by a spouse of a natural parent." Id. at 370, 628 A.2d at 1273 (quotation omitted). The probate court concluded that because Deborah and Jane were not married, this "step-parent exception" did not apply and Deborah could only adopt if Jane relinquished her parental status. Id.
¶ 15. On appeal, this Court first emphasized that the primary concern of Vermont's adoption statutes is to promote the welfare of children and that the statutes should be implemented in a way that promotes that goal. Id. at 371, 628 A.2d at 1273. Noting that "the precise circumstances of these adoptions may not have been contemplated during the initial drafting of the statute," the Court concluded that "[t]he intent of the legislature was to protect the security of family units by defining the legal rights and responsibilities of children who find themselves in circumstances that do not include two biological parents." Id. at 373, 628 A.2d at 1274. With this in mind, the Court rejected a narrow interpretation of the statute, explaining, "we cannot conclude that the legislature ever meant to terminate the parental rights of a biological parent who intended to continue raising a child with the help of a partner." Id. To conclude otherwise, the Court explained, "would produce the unreasonable and irrational result of defeating adoptions that are otherwise indisputably in the best interests of children." Id.
¶ 16. The Court acknowledged the changing family structures that had given rise to the case, and stated:
It is not the courts that have engendered the diverse composition of today's families. It is the advancement of reproductive *565 technologies and society's recognition of alternative lifestyles that have produced families in which a biological, and therefore a legal, connection is no longer the sole organizing principle. But it is the courts that are required to define, declare and protect the rights of children raised in these families, usually upon their dissolution. At that point, courts are left to vindicate the public interest in the children's financial support and emotional well-being by developing theories of parenthood, so that "legal strangers" who are de facto parents may be awarded custody or visitation or reached for support.... It is surely in the best interests of children, and the state, to facilitate adoptions in these circumstances so that legal rights and responsibilities may be determined now and any problems that arise later may be resolved within the recognized framework of domestic relations laws.
Id. at 376, 628 A.2d at 1276.
¶ 17. The specific issue before the Court in In re B.L.V.B. -the availability of second-parent adoptions to unmarried partners-was different from the issue in this case. But several features of the Court's analysis presage our discussion in subsequent decisions, including the Court's recognition that biology and marriage are not the only indicia of family formation that are worthy of judicial recognition; that mutual intent to conceive and parent a child, and follow through in doing so, warrant the law's cognizance; and that our statutes should be construed to bring the recognized framework of our domestic relations laws to families as we find them.
¶ 18. This Court's decision several years later in Titchenal does not necessarily represent a retreat from these principles. In Titchenal, a lesbian couple decided to have a child together. When attempts to conceive through donor insemination failed, one of the women adopted. The second mother did not adopt the child because at the time they did not believe the then-current adoption statute would allow them both to adopt.[2] After the couple split, the nonadoptive mother, who could not at the time have legally married the child's adoptive mother, asked the superior court (predecessor to what is now the "Civil Division of the Superior Court") to invoke its general equitable authority to afford her parent-child contact with the child she had co-parented for many years. The majority rejected a framework in which the family court adjudicates disputes concerning parental rights and responsibilities and parent-child contact in divorce, parentage, dependency and neglect, relief-from-abuse, nonsupport and separation, and other statutory proceedings, but the superior court exerts its equitable powers to adjudicate such disputes outside of statutory proceedings. Titchenal, 166 Vt. at 376-77, 693 A.2d at 684 ; see also Moreau, 2014 VT 31, ¶ 45, 196 Vt. 183, 95 A.3d 416 (Robinson, J., dissenting) (discussing core holding of Titchenal in detail). Much of the Court's discussion in Titchenal focused on the fact that the putative mother was seeking relief in the wrong court on the basis of the wrong theory, and the controlling holding of Titchenal was narrow and turned on the procedural and jurisdictional posture of the case.
¶ 19. Nevertheless, there is no question that in its opinion the Court expressed *566 skepticism about the concept of "de facto parenthood" pursuant to which parental rights, even the more limited right of parent-child contact, may arise from an established parent-child bond in the absence of a legal adoption, biological connection, or marriage. See, e.g., Titchenal, 166 Vt. at 385, 693 A.2d at 689 ("In our view, [the public policy] considerations are not so clear and compelling that they require us to acknowledge that de facto parents have a legally cognizable right to parent-child contact .... "). The Court was particularly concerned that a wide range of adults who had relationships with a child, such as relatives, foster parents, and even day-care providers, might claim rights to parent-child contact on the basis of their parent-like relationships. Id. at 382-83, 693 A.2d at 687-88. This general sensibility, rather than the actual controlling holding, has become the primary legacy of Titchenal .
¶ 20. In Miller-Jenkins, 2006 VT 78, 180 Vt. 441, 912 A.2d 951, the Court had an opportunity to consider a similar case without the jurisdictional problems. In that case, two women who had a child conceived through donor insemination during the course of their civil union were before the court in a statutory civil union dissolution action. The biological mother of the parties' child sought to cut off contact between the child and the nonbiological mother, arguing that a nonbiological putative parent could not be a legally recognized parent. Given that the case arose in the family court in a statutory civil union dissolution case, the primary obstacle that defeated the nonadoptive mother in Titchenal was not present. The nonbiological mother was not invoking equity to claim parent-like rights on the ground that she had a parent-like relationship with the child; her statutory claim was that she was the child's parent.
¶ 21. In ruling that the nonbiological mother in Miller-Jenkins was a legal parent to the child, this Court took several significant analytic steps. First, the Court rejected the argument that the parentage statute-both its use of the term "natural parent" and the presumptions built into that statute-establishes a framework for determining who is and is not a parent under Vermont law. Id. ¶¶ 53-55 ; see 15 V.S.A. § 308. Explaining that the parentage statute does not contain a definition of "parent," and that the presumptions in the statute were designed to allow for summary child support adjudication in certain cases rather than to limit who may and may not be deemed a parent, the Court concluded that the parentage statute was "irrelevant" to determining whether the nonbiological mother was a legal parent. Id. ¶ 55.
¶ 22. Second, and most important, the Court did not conclude that simply by virtue of her civil union with the child's biological mother at the time the child was born, the nonbiological mother was the legal parent. It could have done so. Instead, the Court identified a series of factors that supported its conclusion, including not only the parties' civil union at the time of the child's birth, but also their mutual intention that they would co-parent the child, the nonbiological mother's participation in the decision that the biological mother would give birth through donor insemination, the fact that they both treated the nonbiological mother as the child's parent, and the fact that there was no other person claiming to be the child's parent. Id. ¶ 56. The Court expressly disclaimed the suggestion that a single factor-the parties' civil union-was dispositive. Although it described this factor as "extremely persuasive evidence" of joint parentage, the Court concluded that "[b]ecause so many factors are present in this case that allow us to hold that the nonbiologically-related *567 partner is the child's parent, we need not address which factors may be dispositive on the issue in a closer case." Id. ¶ 58. In that regard, the Court noted, "[t]his is not a close case under the precedents from other states." Id.
¶ 23. Finally, in recognizing that a nonbiological parent's legal status may arise from the parents' mutual agreement to bring a child into their family and raise the child as co-parents, their actual conduct in doing so, and the absence of any other putative parent, the Court never once mentioned the Titchenal decision. The omission could be interpreted as signaling that, while Titchenal may still be good law as to its narrow procedural and jurisdictional holding, that decision's general skepticism toward claims of parentage arising from the mutual intent and conduct of the parents no longer reflected the prevailing view of the Court. But it could also be interpreted as a response to a narrower theory of parenthood, entirely consistent with the Court's rejection of a broad theory of parental rights for people with "parent-like" relationships. In Miller-Jenkins , the putative mother did not cast herself as a legal stranger to the child who was entitled to parental rights through the operation of equity on the basis of her parent-like relationship; she asserted that she was the child's second parent by virtue of her pre-conception agreement with the child's biological mother to bring the child into the world and her post-conception conduct in serving as a second parent to the child. Thus understood, the Court's understanding of parenthood in Miller-Jenkins is not inconsistent with its discussion in Titchenal that rejects a broader theory.
¶ 24. This Court's rejection of a putative parent's claim to parentage in Moreau, 2014 VT 31, 196 Vt. 183, 95 A.3d 416, is not necessarily inconsistent with Miller-Jenkins . The Court in Moreau considered a parentage claim by a father who was not married to the children's birth mother nor biologically related to them, but who had co-parented the children in question for many years with mother's consent and encouragement. The father did not allege that he and the mother agreed in advance to bring the children into their family and raise them together, and, at least in theory, the children had a biological father with a potential claim to parental status on that basis. In rejecting the putative father's parentage claim, the Court hearkened back to Titchenal and this Court's rejection of a broad theory of "de facto" parenthood. In distinguishing Miller-Jenkins , the Court suggested that the Miller-Jenkins holding rested on the parties' civil union status. Id. ¶¶ 15-17.
¶ 25. Together, these decisions, all of which remain good law, establish the framework for this case.
II. Describing the Framework
¶ 26. The best way to understand this series of decisions is that the Court has rejected the broad theory of "de facto" parenthood advanced in Titchenal and necessary to support the putative father's claims in Moreau , but has in Miller-Jenkins embraced a far more targeted exception to its general understanding that parental status arises from biological connection to a child or a marriage or a civil union to a child's legally recognized parent at the time of the child's birth. This narrower framework may be limited to cases like Miller-Jenkins in which a child would otherwise have only one legally recognized parent, the legally recognized parent (usually a biological parent) and the other intended parent have mutually agreed to bring a child into their family to raise the child together as equal co-parents, and the parents have in fact *568 done so.[3] On this view, the fundamental distinction between Moreau and Miller-Jenkins arises from the joint decision of the Miller-Jenkins parents to bring a child into their home in the first place and their joint conduct in doing so. This approach reconciles our past decisions, promotes the best interests of children, and is consistent with the modern trend in other states.
A. Reconciling Our Past Decisions
¶ 27. The framework described above harmonizes all of our past decisions without implicitly overruling or rewriting them, and is consistent with the spirit of our past decisions. The central fear that animated Moreau is of a "broad de facto parent doctrine ... that essentially would allow any former domestic partner to compel a biological parent to defend against the unrelated ex-partner's claim that he or she is a 'parent' entitled to judicially enforced parental rights and responsibilities." 2014 VT 31, ¶ 21, 196 Vt. 183, 95 A.3d 416. The Court in Moreau conceived of Mr. Moreau as an "on-again-off-again" boyfriend who did not jointly plan with the children's mother to form a family but, rather, came along and helped parent the children for a period of time. Id. ¶ 1. In the context of that vision of the record, the Moreau Court was resistant to a legal regime that would allow a mother to unwittingly afford her boyfriend the rights that flow from a legally recognized parental status merely by relying on him to help parent the children during the course of their relationship. See also Titchenal, 166 Vt. at 382-83, 693 A.2d at 688 (noting concern that relatives, foster parents, and even day-care providers might claim rights to parent-child contact on basis of parent-like relationships).
¶ 28. These concerns do not apply to the more restrictive test articulated in Miller-Jenkins, in which the Court assigned considerable significance to the following facts: before bringing the child into their family, both parents intended and expected that the nonbiological parent would be the child's legal parent; the nonbiological mother participated in the decision that the biological mother would bear a child conceived through donor insemination and participated actively in the prenatal care and birth; both parents treated the child as a child of both the biological and nonbiological mother during the course of their relationship; and there was no other person with a claim to parental status, as the child was conceived using an anonymous sperm donor. 2006 VT 78, ¶ 56, 180 Vt. 441, 912 A.2d 951. The facts and legal factors set forth in Miller-Jenkins do not raise the specter of accidentally created legal parenthood, but do allow for legally recognized parental status in limited circumstances, arising from the joint decision and actions of the legal and putative parent, even in the absence of a biological or adoptive relationship between putative parent and child or marriage (or civil union) between the parents. The parties' mutual plan to bring a child into their family to co-parent and their joint actions in pursuit of that plan distinguish Miller-Jenkins from Moreau and explain the divergent analyses in the two decisions.
B. Promoting the Welfare of Children
¶ 29. This narrow framework focusing on the pre-conception agreement of the parents would promote the welfare of children without undermining parental rights. As this Court has repeatedly recognized, *569 the core purpose of our various laws relating to parent-child status is to protect the welfare of children. See, e.g., In re B.L.V.B., 160 Vt. at 371, 628 A.2d at 1273 ("In interpreting Vermont's adoption statutes, we are mindful that the state's primary concern is to promote the welfare of children ...."). The Court's "paramount concern should be with the effect of our laws on the reality of children's lives." Id. at 376, 628 A.2d at 1276.
¶ 30. The even narrower view-limiting parental status to individuals who are biologically linked to the child, have legally adopted, or are married or joined in civil union with the child's legal parent at birth-would have dire consequences for many children. Under such a regime, even if two parents mutually agree to bring a child into their home and raise that child together, even if the child comes into the home with no other potential parental attachments (because, for example, the child was conceived through anonymous sperm donation), even if those parents raise the child as fully equal co-parents, even if the parents themselves intended and believed they were both the child's legal parents, and even if neither the child nor anyone in the world outside of the child's family ever had any reason to doubt that both parties were, in fact, the child's legal parents, upon termination of the parties' relationship with each other the children can legally be denied any continued relationship with one of the parents and any financial or other support from that parent. It is hard to imagine how such an approach that allows for a complete and involuntary severing of a lifelong parent-child relationship could possibly promote children's welfare. In many cases, the consequences of such a rule would be nothing short of tragic.
¶ 31. The New York Court of Appeals recently recognized the negative impact on children of a doctrine that entirely foreclosed nonbiological and nonadoptive parents from seeking parental rights, even when they had planned with a partner to bring a child into the family, noting that "[a] growing body of social science reveals the trauma children suffer as a result of separation from a primary attachment figure ... regardless of that figure's biological or adoptive ties to the children." Brooke S.B. v. Elizabeth A.C.C., 28 N.Y.3d 1, 39 N.Y.S.3d 89, 61 N.E.3d 488, 499 (2016). That court observed that a rule that fixates on biology "has inflicted disproportionate hardship on the growing number of nontraditional families" in that state. Id.
¶ 32. Our prior cases reflect a concern for protecting the parental rights of a legally recognized parent by refusing to dilute those rights by recognizing a second legally recognized parent on the basis that the latter at some point assumed parental responsibilities for the child. But where a parent jointly plans and conceives a child with a partner, with the mutual intent and agreement to raise that child together, that parent has no reasonable expectation of sole parental rights in the event of a breakup. The understanding that our cases reject a broad theory of de facto parenthood, but at the same time recognize a narrow class of cases in which neither marriage nor biology is a prerequisite to parental status, protects against the erosion of the reasonable expectations of legal parents while ensuring that children in those families can benefit from the ongoing relationship with and support of a lifelong parent.
C. Modern Trend
¶ 33. Adopting this approach puts Vermont in line with the modern trend, and with all of our fellow New England states that have recognized some limited circumstances in which an intended parent may be legally recognized even in the absence *570 of biological or marital connection. For example, in Brooke S.B., the New York Court of Appeals recently overruled its longstanding precedent and concluded that in certain circumstances New York law gives a nonbiological, nonadoptive parent standing to petition for custody and visitation. 39 N.Y.S.3d 89, 61 N.E.3d at 499-500. In that case, two different unmarried lesbian couples each jointly decided to have a child and raise the child together. In both cases, pursuant to mutual agreement, one mother became pregnant through donor insemination, and the other participated in prenatal appointments and was present and engaged during the child's birth. In both cases, the nonbiological mother and the biological mother shared the range of parental responsibilities for a period of years. And in both cases the mothers broke up and the nonbiological mother's parental status became an issue.
¶ 34. In reviewing the cases, the Court of Appeals considered its longstanding precedent, established in Alison D. v. Virginia M., 77 N.Y.2d 651, 569 N.Y.S.2d 586, 572 N.E.2d 27 (1991), concluding in the context of a similar fact pattern that the nonbiological mother had no standing to seek visitation with the child. The Brooke S.B. court explained that in Alison D. it had been concerned about preserving the rights of biological parents, and that because the legislature had expressly allowed specified nonparents to seek custody or visitation it did not intend to allow others to do so. Brooke S.B., 39 N.Y.S.3d 89, 61 N.E.3d at 494. However, the court acknowledged then-dissenting Judge Kaye's prediction that the court's decision in Alison D."would 'fall[ ] hardest' on the millions of children raised in nontraditional families-including families headed by same-sex couples, unmarried opposite-sex couples, and stepparents," as well as her argument that the majority opinion in Alison D." 'turn[ed] its back on a tradition of reading [New York's statute] so as to promote the welfare of the children.' " Id. (quoting Alison D., 569 N.Y.S.2d 586, 572 N.E.2d at 30, 32 (Kaye, J., dissenting)). Revisiting Judge Kaye's prescient dissent, the court in Brooke S.B. concluded that this was one of the "rarest of cases" in which the court may overrule a prior decision on the basis of "an extraordinary combination of factors" that undermine "the reasoning and practical viability" of the prior decision. Id., 39 N.Y.S.3d 89, 61 N.E.3d at 497.
¶ 35. In reaching this conclusion, the court reasoned that Alison D. strayed from the longstanding practice in New York courts of resolving matters of custody, visitation, and support in a manner that serves the best interests of children, id., and considered the impact of the prior holding on children's best interests. The court concluded that, as projected by Judge Kaye, "[b]y 'limiting their opportunity to maintain bonds that may be crucial to their development,' the rule of Alison D. has 'fall[en] hardest on the children.' " Id., 39 N.Y.S.3d 89, 61 N.E.3d at 498 (quoting Alison D., 569 N.Y.S.2d 586, 572 N.E.2d at 30 (Kaye, J., dissenting)). Citing a litany of scholarly sources, the court acknowledged the trauma to children of separating them from a lifelong parent. Id., 39 N.Y.S.3d 89, 61 N.E.3d at 499. The court concluded that children have fundamental liberty interests in preserving intimate family bonds that must "inform the definition of 'parent,' a term so central to the life of a child." Id., 39 N.Y.S.3d 89, 61 N.E.3d at 499-500. Summarizing its reasons for overruling Alison D., the court explained:
The "bright-line" rule of Alison D. promotes the laudable goals of certainty and predictability in the wake of domestic disruption. But bright lines cast a harsh light on any injustice and, as predicted by Judge Kaye, there is little *571 doubt by whom that injustice has been most finely felt and most finely perceived. We will no longer engage in the "deft legal maneuvering" necessary to read fairness into an overly-restrictive definition of "parent" that sets too high a bar for reaching a child's best interest and does not take into account equitable principles.
Id., 39 N.Y.S.3d 89, 61 N.E.3d at 500 (citations omitted).
¶ 36. Although the court overruled its holding in Alison D., it took an extremely cautious approach to expanding the definition of "parent." It declined to adopt the kind of functional test for standing that has been employed in other jurisdictions, and that considers a variety of factors, "many of which relate to the post-birth relationship between the putative parent and the child." Id. It likewise declined to adopt a test that would apply globally in cases involving all nonbiological, nonadoptive, nonmarital parents who are raising children: "We reject the premise that we must now declare that one test would be appropriate for all situations, or that the proffered tests are the only options that should be considered." Id. Instead, the court focused on the allegations in both cases that the couples entered into a pre-conception agreement to conceive and raise a child as co-parents. It declined to decide in that case whether, in a case where a biological or adoptive parent consented to the creation of a parent-like relationship between his or her partner and child after conception, the partner may later seek visitation and custody. Id. Instead, the court left for another day all issues involving variations on the facts before it and decided narrowly that where a petitioner proves by clear and convincing evidence that he or she has agreed with the biological parent of the child to conceive and raise the child as co-parents, the petitioner has standing to seek custody and visitation of the child. Id., 39 N.Y.S.3d 89, 61 N.E.3d at 500-01. The New York Court of Appeals' approach in Brooke S.B. is consistent with this Court's decisions in both Moreau and Miller-Jenkins insofar as the mutual intent of the mothers at the time they brought the child into their family, rather than agreements or conduct after that time, was determinative.
¶ 37. Similarly, last year, the Massachusetts Supreme Judicial Court unanimously issued a decision protecting parent-child relationships in limited circumstances. In Partanen v. Gallagher, a nonbiological mother sought to establish parentage through a state statute that created a presumption of fatherhood when a child was born to unmarried parents and the parents " 'received the child into their home and openly held out the child as their child.' " 475 Mass. 632, 59 N.E.3d 1133, 1135 (2016) (quoting Mass. Gen. Laws Ch. 209C, § 6(a)(4) ). Construing the parentage statute in gender neutral terms, the court concluded that "[n]othing in the language of [the statute] expressly limits its applicability to parentage claims based on asserted biological ties." Id. at 1138. It emphasized that a biological connection is not necessary to the establishment of parentage under the statute, and that the "consideration of what is in a child's best interests will often weigh more heavily than the genetic link between parent and child." Id. at 1139 (quotation omitted). Noting that the statute's stated purpose was to provide "[c]hildren born to parents who are not married to each other ... the same rights and protections of the law as all other children," id. at 1138 (quotation omitted), the court construed the statute to protect the parental status of the nonbiological parent despite the fact that she was not married to the biological mother. Id. Responding to the suggestion that its decision undermined the rights of the biological mother, the court explained, "[t]he question in this case ... is not whether courts *572 may impose a second parent onto a single-parent family, but whether this was, in fact, a single-parent family in the first place." Id. at 1141. Citing cases from other states, the court added that "courts in other jurisdictions have read comparable provisions to establish parentage in the absence of biological relationships, and have done so, in part, out of concern for the welfare of children born out of wedlock." Id.
¶ 38. The New York and Massachusetts decisions reinforce the modern trend, and both offer a carefully limited analysis of nonbiological and nonmarital parenthood, focusing on the parties' agreement and intentions at the time they brought a child into their home.[4]
III. Application to this Case
¶ 39. Plaintiff's parentage claim concerning the younger child, M.P., arguably fits within this narrow framework established by our existing cases.[5] Plaintiff's affidavit avers that the parties jointly decided to bring the second child into their family through adoption; that they decided defendant would be the adoptive parent because the adoption agency prohibited adoption by same-sex couples; that they mutually intended that plaintiff would co-parent both children; that both parents acted and held themselves out to each other, the children, and the outside world-including doctors, teachers, family, and acquaintances-as the children's parents; that they mutually intended for plaintiff to adopt both children but failed to complete a second-parent adoption later only because life presented more urgent demands on their time and energy; that after they separated they entered into a shared custody agreement with equal division *573 of the children's time; that after they split up they attended family counseling to work on their co-parenting; and that the children called plaintiff "mom" and viewed her as their mother. These facts, if proven, could establish plaintiff's parentage claim.[6]
IV. The Court's Responsibility
¶ 40. Like the dissent, we encourage the Legislature to take action in this area. But, the Legislature's inaction to date is not an impediment to our own obligation to resolve the specific cases before us by developing a consistent and coherent approach to defining parenthood within the construct that the Legislature has given us and our prior case law; in fact, it creates a more urgent need for us to act.
¶ 41. The contrast between the dissent's suggestion that needed reform in this area must come from the Legislature, and this Court's previous explanations of our responsibilities, is striking. In Miller-Jenkins, this Court concluded that the parentage statute does not define who is a parent, but instead "leav[es] it to the courts to define who is a parent for purposes of a parentage adjudication." 2006 VT 78, ¶ 54, 180 Vt. 441, 912 A.2d 951. The Court explained that "the term 'parent' is specific to the context of the family involved," id. ¶ 55, and sought to define the term with reference to the case before it. In doing so, the Court recognized that the Legislature had not addressed the particular circumstances it was facing, and acknowledged that "the courts must define and protect the rights and interests of the children" that are part of families that have not yet been addressed by the Legislature. Id. ¶ 52. In doing so, the Court repeated its commitment, in the absence of legislative guidance, to develop theories of parenthood to protect the welfare of children.
¶ 42. If this particular case was all that was at stake, then notwithstanding the potentially heartbreaking and destructive outcome for the children involved in this case, the dissent's reluctance to engage might be understandable. But this is just one of a wide variety of cases that we will undoubtedly see in the coming years. "Surrogacy" of various stripes (involving genetic material from one or both intended parents, the gestational carrier's egg and donor sperm, donor egg and sperm, or various such combinations) is increasingly common and can involve gay and straight couples as well as individuals. Many gay *574 and straight individuals and couples, like the couple in this case, bring children into their families through adoptions that do not fit the paradigm to which courts are most accustomed. Some women and men opt for single parenthood. Some family structures incorporate more than two parents. Families are evolving, and we will no doubt continue to be asked to decide cases involving a variety of family structures. In the absence of statutory guidance, we need a coherent vision of parenthood and family to guide our case-by-case consideration of these various circumstances-or at least a rule that promotes the best interests of children in cases like this in which parents jointly agree to bring a child into their family and co-parent together.
¶ 43. To fill the statutory void, and until the Legislature acts, the concept of an "intended parent," implicitly recognized in Miller-Jenkins , suggests a broader rubric that may help us grapple with many of these future cases predictably and in the best interests of children, without relying on ad hoc decisionmaking that would provide limited predictability and could potentially be influenced by the perceived merits of the individual parents, and putative parents, before us.[7]
¶ 44. We continue to urge the Legislature to take action in this realm, and hope that the study commissioned by the Legislature and cited by the dissent, post, ¶ 59, leads to the enactment of statutory revisions that render this decision, and others cited above, obsolete. The global perspective, consideration of extensive empirical evidence, and public input and accountability of the legislative process are better suited than case-by-case adjudications to developing a coherent law of parental status. But today we have a live case before us, and our statutory guidance is what it is. In the absence of legislative guidance, we must resolve these cases with the tools that we have. These cases involve real families who need to resolve their conflicts today. "Our constitutional responsibility to consider the legal merits of issues properly before us provides no exception for the controversial case." Baker v. State, 170 Vt. 194, 197, 744 A.2d 864, 867 (1999).
The dismissal of petitioner's claims with respect to G.P. is affirmed. The dismissal of this case with respect to M.P. is reversed, and the matter is remanded for further proceedings in accordance with this opinion.

We refer to the absence of a "biological" relationship because this is the term this Court, and many other courts, have commonly used. This more general term arguably encompasses two different kinds of relationship: genetic and gestational. In most cases, a gestational parent-the parent who gives birth to a child-is also a genetic parent of a child, but in cases in which a gestational parent carries another's egg, that may not be the case. In this case, the putative second parent is neither a gestational nor genetic parent.

The adoption occurred in 1991. As noted above, the Vermont Supreme Court first concluded that the adoption statute permitted second-parent adoption by a legal parent's unmarried partner in 1993. See In re B.L.V.B., 160 Vt. 368, 628 A.2d 1271. In 1996, the Legislature amended the adoption statute to expressly authorize second-parent adoption as well as joint adoption by unmarried partners. 1995, No. 161 (Adj. Sess.).

We have not considered a case in which more than two individuals claim parental status on the basis of biology, marriage or civil union, or the factors identified above, and have no occasion to do so in this case.

Using a range of approaches, our other New England neighbors have likewise afforded parental status or some form of parental rights to nonbiological, nonmarital parents in cases like this. See Roth v. Weston, 259 Conn. 202, 789 A.2d 431, 450 (2002) (codified by Conn. Gen. Stat. Ann. § 46b-59(b) ) (holding that petitions for visitation by third parties must include allegations that parent-like relationship exists with child and that denial of visitation would cause real and significant harm); Pitts v. Moore, 2014 ME 59, ¶ 27, 90 A.3d 1169 (requiring adult seeking rights as de facto parent to have undertaken "permanent, unequivocal, committed, and responsible parental role in the child's life" (quotation omitted)); A.H. v. M.P., 447 Mass. 828, 857 N.E.2d 1061, 1070 (2006) (granting de facto parental status when there is no biological relation but adult "resides with the child and, with the consent and encouragement of the legal parent, performs a share of caretaking functions" (quotation omitted)); In re Guardianship of Madelyn B., 166 N.H. 453, 98 A.3d 494, 501 (2014) (interpreting N.H. Rev. Stat. Ann. § 168-B:2, which creates presumption of paternity when plaintiff holds himself out as child's "father," to apply to women and to people not biologically related to child); Rubano v. DiCenzo, 759 A.2d 959, 967 (R.I. 2000) (interpreting 1956 R.I. Gen. Laws § 15-8-26, which allows "any interested party" to bring action to determine existence of parent-child relationship, to require plaintiff to show "parent-like relationship" with child). For further discussion of the range of approaches courts have taken in recognizing the parental status of, or affording some parental rights to, parents who are not biologically related to their children, see Moreau, 2014 VT 31, ¶¶ 60, 69-78, 196 Vt. 183, 95 A.3d 416 (Robinson, J., dissenting).

Plaintiff has alleged that defendant adopted the older child, G.P., before the parties' relationship began, and has not alleged that the adoption was a joint endeavor. Given these allegations, the narrower framework described above does not support plaintiff's parentage claim with respect to the older child, G.P. This Court's ruling in Moreau, 2014 VT 31, ¶ 21, 196 Vt. 183, 95 A.3d 416, bars plaintiff's parentage claim in regard to G.P. Plaintiff could have legally adopted G.P., and still may, with defendant's consent, but cannot rely on the framework developed through our prior decisions to support her parentage claim. Accordingly, this analysis is confined to M.P.

We recognize that in this case, in contrast to Miller-Jenkins , the couple brought the child into their family through adoption by one mother, rather than donor insemination and childbirth by one mother. But considering the reasonable expectations of the parents, the best interests of the child, and the desire for a coherent framework for discerning who is and is not a parent, there is no principled basis for distinguishing a couple that decides to bring a child into their family through donor insemination and childbirth from a couple in which one of the mothers adopts pursuant to a joint plan to acquire and parent a child together. This is especially true given the practical obstacles that remained (and remain to some extent today) for same-sex couples seeking to legally adopt as a couple. For example, see A. Newman, Same-Sex Parenting Among a Patchwork of Laws: An Analysis of New York Same-Sex Parents' Options for Gaining Legal Parental Status, 2016 Cardozo L. Rev. de novo 77, 87 ("Even after the Obergefell decision the legality of same-sex adoption is unclear in many states. In the wake of the Supreme Court's decision the effects on adoption laws are still in flux, with some courts still making adverse decisions based on prospective parents' same-sex relationships."); J. Mertus, Barriers, Hurdles, and Discrimination: The Current Status of LGBT Intercountry Adoption and Why Changes Must Be Made to Effectuate the Best Interests of the Child, 39 Cap. U. L. Rev. 271, 281-82 nn.59 & 60 (2011) (listing countries that prohibit same-sex couples from adopting children).

For a discussion of courts' consideration of parental intent in discerning parental status in cases in which children are conceived by means other than sexual intercourse, see K. Baker, Bargaining or Biology? The History and Future of Paternity Law and Parental Status, 14 Cornell J.L. & Pub. Pol'y 1, 26-30 (2004).