Merrimack County Probate Court
No. 2001-729

IN RE BABY GIRL P.

Argued: March 13, 2002
Opinion Issued: June 21, 2002

*Law Office of Joshua L. Gordon*, of Concord (*Joshua L. Gordon* on the brief and orally), for Jeffrey and Melinda S.

*Colton L.*, of Phoenix, Arizona, by brief and orally, *pro se.*

DUGGAN, J. Jeffrey and Melinda S., the prospective adoptive parents of Baby Girl P., appeal the decision of the Merrimack County Probate Court (*Hampe*, J.) dismissing their petition for adoption and returning the child to her biological father, Colton L. We reverse.

The record supports the following facts. Baby Girl P. was born in November 2000 in Phoenix, Arizona. Her natural parents were not married and the birth certificate issued on the date of the child's birth is blank as to the name of the father. When the baby was ten days old, her birth mother signed a consent to adoption and, pursuant to Arizona law, an

affidavit naming "Jamal [L.]" as the natural father. *See* Ariz. Rev. Stat. Ann. § 8-106(F) (West Supp. 2001); RSA 170-B:9, II(b) (Supp. 2001) ("if the [natural] parent does not reside in New Hampshire, . . . consent may be taken pursuant to the laws of the state where [he or she] resides"). In the affidavit, the birth mother indicated that the child was conceived in Arizona, that the pregnancy was a result of a one-night relationship and that she did not know any identifying information of the natural father. On November 20, Jeffrey and Melinda S., who reside in New Hampshire, took custody of the child and, on December 4, filed a petition for adoption in the New Hampshire probate court.

In January 2001, a search of the Arizona putative fathers registry indicated that no one had filed notice of a paternity claim pertaining to Baby Girl P. *See* Ariz. Rev. Stat. Ann. § 8-106.01(B) (West 1999). In April 2001, the probate court in New Hampshire published notice of the adoption in an Arizona newspaper. Colton L. responded, indicating his intent to claim paternity.

Colton L., also known as "Jamal [L.]," claims that he and the birth mother had a several-month relationship. He states that he knew of the pregnancy and that the birth mother had contemplated adoption, but that he was incarcerated during most of the pregnancy and at the time of the child's birth. After a paternity test ordered by the probate court in May 2001 confirmed him to be the biological father, he refused to consent to the adoption.

The probate court, applying New Hampshire law, ruled that when it becomes aware of the alleged biological father's name, it must provide notice to him, and, if his paternity is established, he must either consent to the adoption or have his parental rights terminated in order for the adoption to be granted. The court found that the adoption in this case could not go forward since Colton L. did not consent to the adoption and since none of the statutory grounds for termination of his parental rights applied. The court dismissed the petition for adoption and ordered custody of the child to be with Colton L. This appeal followed.

On appeal, Jeffrey and Melinda S. argue that the probate court erred in: (1) applying New Hampshire law to the issue of consent; (2) waiving New Hampshire's requirement that the biological father claim paternity before the mother's consent or relinquishment; (3) disregarding Arizona's putative fathers registry; (4) not conducting a home study of Colton L.; and (5) placing the child in the custody of Colton L., who they allege is a poor role model.

We review a decision of the probate court for errors of law and will not disturb its factual findings "unless they are so plainly erroneous that such findings could not be reasonably made." RSA 567-A:4 (1997); *see In re Sky*

*D.*, 138 N.H. 543, 545 (1994). "Adoption is a creature of statute, and, as such requires strict observance of the statutory requirements." *In re Micah HH*, 690 N.Y.S.2d 309, 311 (App. Div. 1999) (quotation and ellipses omitted). Accordingly, our analysis begins with an interpretation of the applicable state statutes. *See In re Sky D.*, 138 N.H. at 545.

█ Our first task is to decide which State's law applies to the issue of consent. In general, the law of the forum State applies to adoption cases. RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 289 (1971). Other courts have recognized that this rule is not to be strictly construed, as "[c]ircumstances might permit or compel a state exercising adoption jurisdiction to defer to the substantial and dominant interest of a foreign state and to apply the law of that state in deciding some or all of the issues." *Matter of Adoption of Child by T.W.C.*, 636 A.2d 1083, 1090 (N.J. Super. Ct. App. Div. 1994). Here, the natural mother's consent contemplated that the adoption would take place pursuant to New Hampshire law. Moreover, the prospective adoptive parents reside in this State and filed their adoption petition here. We therefore turn to New Hampshire's adoption statute, RSA chapter 170-B, to determine if Colton L. was entitled to notice and the right to consent to the adoption.

On questions of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. *Petition of Hoyt*, 143 N.H. 533, 535 (1999). It is well established that the intention of the legislature expressed by the words in the statute itself is the touchstone to its meaning. *Id.* Accordingly, when a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent, and we refuse to consider what the legislature might have said or add language that the legislature did not see fit to incorporate in the statute. *Id.*

Under our adoption statute, consent to a proposed adoption must be obtained from the mother, the legal father and, in certain circumstances, the natural father. RSA 170-B:5, I(b)-(d) (Supp. 2001). The statute defines legal father as the person designated as the father either (a) on that child's birth certificate, (b) pursuant to court order resulting from a paternity action, or (c) upon legitimation when the parents marry. RSA 170-B:2, XIII (Supp. 2001). Natural father is defined as "a person other than a legal father who has been named as the father of the child, or who is the subject of a pending paternity action, or who has filed an unrevoked notice of intent to claim paternity of the child pursuant to RSA 170-B:5-a, I(c)." RSA 170-B:2, XIV (Supp. 2001).

■ Colton L. does not meet any of the statutory requirements to be the legal father. He was not listed on the child's birth certificate, he was not designated as the father in a paternity action, and he did not legitimate the child by marrying the natural mother.

■ In determining that Colton L.'s consent was required, the probate court relied on the fact that a paternity test conducted after the adoption proceedings had begun showed that he was the "biological father." Although not explicit in its order, the court presumably assumed that as the biological father, Colton L. was the legal father, and thus his consent was required. The implication of this interpretation is that a putative father can circumvent the statutory scheme set forth in RSA chapter 170-B, which articulates a point in time after which a person is barred from bringing a paternity action. *See* RSA 170-B:5-a (Supp. 2001).

We hold that the determination of Colton L.'s paternity in this case was not the type contemplated by the adoption statute. An important goal of the statute is to promote finality for the child by identifying, as early as possible in a child's life, the rights, interests and obligations of all the parties. Consistent with this goal, a better reading of the statute is that a "person designated as the father pursuant to court order resulting from a paternity action" is one who has been adjudicated to be the father in an action such as pursuant to RSA chapter 168-A, in which the mother seeks support, and whose child is later put up for adoption. The statute is clearly not meant to allow a person to ignore his paternal obligations and then frustrate the adoption after the natural mother has consented and the adoption petition has been filed. For these reasons, Colton L. does not fall within the definition of "legal father" set forth in RSA 170-B:2, XIII(b).

Because the birth mother named Colton L. as the father in an affidavit, we assume that he falls within the statutory definition of natural father. Under the statute, consent from the natural father is required if he was entitled to notice and the right to consent under RSA 170-B:5-a. RSA 170-B:5, I(d).

RSA 170-B:5-a, I, lists four categories of putative fathers entitled to notice of a proposed adoption and the right to request a hearing to prove paternity:

> (a) A person named by the natural mother in an affidavit filed with the court, prior to the mother voluntarily relinquishing her rights pursuant to RSA 170-B:8, the mother consenting to an adoption pursuant to RSA 170-B:9, or the mother's parental rights being involuntarily terminated;

(b) The natural or legal father, if his identity is known by the court ... or the proposed adoptive parents or their attorney, prior to the mother voluntarily relinquishing her rights pursuant to RSA 170-B:8, the mother consenting to an adoption pursuant to RSA 170-B:9, or the mother's parental rights being involuntarily terminated;

(c) A person who claims to be the father and who has filed notice of his claim of paternity with the office of child support enforcement ... prior to the mother's rights being voluntarily relinquished pursuant to RSA 170-B:8, the mother consenting to an adoption pursuant to RSA 170-B:9, or involuntarily terminated....

(d) A person who is openly living with the child or the child's mother and providing financial support to the mother or child at the time any action under this chapter is initiated and who is holding himself out to be the child's father prior to the mother voluntarily relinquishing her rights pursuant to RSA 170-B:8, the mother consenting to an adoption pursuant to RSA 170-B:9, or the mother's parental rights being involuntarily terminated.

█ In 1996, the legislature amended the statute, making these four provisions consistent with one another. Laws 1996, 46:4, :5. As amended, each provision refers to the time period before the natural mother relinquishes her rights, consents to the adoption or has her rights involuntarily terminated to determine whether a putative father is entitled to notice. Thus, in order for Colton L. to have been entitled to notice, one of the following must have occurred *prior to the natural mother consenting to the adoption*: (1) an affidavit in which the natural mother names him as the father must have been filed with the court; (2) his identity must have been known by the court, the adoptive parents or their attorney; (3) he must have filed notice of intent to claim paternity with the office of child support enforcement; or (4) he must have been holding himself out to be the child's father.

Interpreting the statute to require that the affidavit be filed with the court or that the father's identity be known by the court, the adoptive parents or their attorney prior to the mother consenting to the adoption is consistent with sections (c) and (d), both of which provide a specific time period during which a father can act to protect his interests in the child. For example, in section (c), the father can preserve his rights by filing a notice of his paternity claim with the office of child support enforcement. RSA 170-B:5-a, I(c). "The notice form may be filed prior to the birth of the

child but *must* be filed prior to . . . the mother consenting to an adoption . . . . Failure to file the notice prior to this time shall bar the alleged father from thereafter bringing an action to establish his paternity of the child . . . .". RSA 170-B:5-a, I(c) (emphasis added). Similarly, in section (d), a putative father protects his rights by "openly living with the child or the child's mother and providing financial support to the mother or child at the time any action under this chapter is initiated and who is holding himself out to be the child's father prior to . . . the mother consenting to an adoption . . . ." RSA 170-B:5-a, I(d).

Thus, sections (c) and (d) of the statute explicitly provide that the moment the mother consents to the adoption serves as the cutoff point, after which the putative father is barred from asserting his parental rights. Under section (c), for instance, a father who files a notice of intent to claim paternity *after* the mother consents, and who does not fit into any of the other categories in RSA 170-B:5-a, I, is deemed to have abandoned the child and is not entitled to notice of the adoption proceeding. It would be illogical to interpret the statute to confer lesser rights, by limiting the time frame by which he can act, to a father who affirmatively asserts his interest in the child, than to the father who does not come forward but who becomes known by the court in some other way.

One of the stated purposes of the statute is to protect the adoptive child from unnecessary separation from his or her natural parents. RSA 170-B:1, I (Supp. 2001). A corollary goal is to promote "prompt finality that protects the child's interests . . . . Otherwise a young child languishes in limbo – surrendered by the mother, unclaimed by the father, and bonding with others – from which the law cannot extricate the child without lengthy proceedings compounding the harm." *Matter of Pima Cty. Juv. Severance Action*, 876 P.2d 1121, 1132 (Ariz. 1994) (citation omitted).

Consistent with this purpose, the legislature has articulated a time period during which a putative father has the opportunity to establish his parental rights. If, before the mother's consent is given, the father's identity is not known by the courts, the adoptive parents or their attorney or he fails to come forward, he is thereafter barred from bringing any action to establish paternity. That the natural mother knows of his identity is irrelevant to the statutory analysis. Indeed, under the statute, a natural mother is not required to identify anyone as the father. If she does name someone and, prior to her consenting, his identity becomes known by the court – either through a filed affidavit or otherwise – or to the adoptive parents or their attorney, then he is entitled to notice of the adoption proceedings. This statutory scheme protects a putative father's rights by giving him several avenues by which he can preserve his parental interests while, at the same time, protecting the privacy of unwed mothers and

allowing adoptions to take place soon after birth. By specifying the time period in which an alleged father must either be known or have acted in some way, the statute promotes safe and secure placements.

Our interpretation of the statute does not allow the mother to unilaterally divest a father of his paternal interests. As previously stated, a biological father has an opportunity to come forward. However, in order to protect the interests of the child, the legislature has provided that the unwed father's opportunity to preserve his right is decidedly limited in duration. Choosing the point at which the natural mother consents to the adoption ensures that the placement is effectuated in an expedient manner. Other States similarly require a biological father to take immediate action. *See, e.g.,* Mont. Code Ann. § 42-2-206 (2001) (to be entitled to notice, putative father must file with putative father registry within seventy-two hours of child's birth); Ohio Rev. Code Ann. § 3107.07(B) (Anderson 2000) (consent not required from putative father who fails to register with the putative father registry within thirty days of child's birth); *cf. Matter of Adoption of Doe,* 543 So. 2d 741, 746 (Fla.), *cert denied,* 493 U.S. 964 (1989) (father's lack of prenatal support is relevant to determination of abandonment for purposes of adoption).

The dissent contends that the phrase "prior to the mother consenting to an adoption" modifies when a court must give notice to a putative father. It reads the statute to mean that regardless of when the father becomes known to the probate court, he is entitled to notice. Under the dissent's interpretation, the mother is not able to effectively consent or surrender the child until the putative father has received notice, is given an opportunity to prove paternity and, if he is in fact the father, provides his consent. As a practical matter, this would require a birth mother to wait more than thirty days, the period required for notice to the putative father plus the time necessary to have paternity testing done. The statute simply does not say this. In fact, the statute allows consent to be executed seventy-two hours after birth. RSA 170-B:7 (1994).

■ The record in this case indicates that, before the natural mother consented to the adoption, none of the conditions in RSA 170-B:5-a, I, was met. The affidavit in which the natural mother named Colton L. as the father was not filed with the court prior to her consenting to the adoption. Likewise, there is nothing in the record indicating that a court in either Arizona or New Hampshire, the adoptive parents or their attorney knew of Colton L.'s identity before the natural mother's consent was given. Moreover, Colton L. did not take any action, such as filing a notice of intent to claim paternity or holding himself out to be the child's father, prior to the natural mother consenting. Both of these avenues were

available to him and would have protected his interests in the child. Because Colton L. does not fit into any of the categories in RSA 170-B:5-a, I, we hold that he was not entitled to notice and, therefore, under RSA 170-B:5, I(d), his consent to the adoption was not required.

■ Colton L. argues that his parental rights have not been terminated, and therefore the adoption cannot go forward. This is a misconstruction of the law. Termination of the natural parent's parental rights is not a prerequisite for all adoptions. In New Hampshire, parents whose parental rights have been terminated are just one category of persons not required to consent to an adoption. *See* RSA 170-B:6 (Supp. 2001). Consent is also not required of an "unwed father who has not met the requirements of RSA 170-B:5, I or RSA 170-B:5-a." RSA 170-B:6, I. For reasons previously stated, Colton L. did not meet these requirements.

■ Colton L. further argues that the adoption should not go forward because the birth mother committed perjury by falsely swearing in her affidavit that the natural father's whereabouts and identifying information were unknown. Since he did not meet the requirements under New Hampshire's adoption statute, he was not entitled to notice regardless of any alleged improper actions of the birth mother.

Finally, in his response to the notice of appeal, Colton L. makes passing reference to a federal constitutional claim. Because he neither addresses this argument in his brief nor argued it below, we deem it waived. *See Keenan v. Fearon*, 130 N.H. 494, 499 (1988) ("off-hand invocations" of constitutional rights supported by neither argument nor authority warrant no extended consideration).

*Reversed.*

BROCK, C.J., and BRODERICK, J., concurred; DALIANIS, J., with whom NADEAU, J., joined, concurred in part and dissented in part.

DALIANIS, J., concurring in part and dissenting in part. I agree that adherence to the general rule that the law of the forum State governs adoptions should be followed in this case. New Hampshire has the most substantial connection to the proceeding and application of New Hampshire law will best uphold the reasonable expectations of the parties. *See Stubbs v. Weathersby*, 892 P.2d 991, 997-98 (Or. 1995).

I disagree, however, with the majority's conclusion that the consent of the biological father was not required because he was not entitled to notice and an opportunity to prove paternity. *See* RSA 170-B:5, I(d) (Supp. 2001); RSA 170-B:6 (Supp. 2001).

RSA 170-B:5, I(d) provides that consent must be obtained from the natural father "provided that he was found to be entitled to notice and . . . the right to consent under RSA 170-B:5-a." *See also* RSA 170-B:6. RSA 170-B:5-a, I(a) (Supp. 2001) provides that notice and an opportunity to prove paternity must be given to "[a] person named by the natural mother in an affidavit filed with the court, prior to . . . the mother consenting to an adoption pursuant to RSA 170-B:9." RSA 170-B:5-a, I(b) (Supp. 2001) similarly provides that notice and an opportunity to prove paternity must be given to "[t]he natural or legal father, if his identity is known by the court, . . . or the proposed adoptive parents or their attorney prior to . . . the mother consenting to an adoption pursuant to RSA 170-B:9."

The majority reasons that the biological father was not entitled to notice and an opportunity to prove paternity under RSA 170-B:5-a, I, because the biological mother named him in an affidavit that was not filed with the court before she consented, and because his identity was not known by the prospective adoptive parents, their attorney, or the court before she consented. The majority concludes, therefore, that the biological father's consent was not required under RSA 170-B:5, I(d).

At the outset, I note the majority's conclusion is based upon an argument which the prospective adoptive parents did not preserve. In probate court, the petitioners affirmatively requested that notice to the biological father be provided pursuant to RSA 170-B:5-a (Supp. 2001). On appeal, they argue, for the first time, that the court erroneously granted their own motion. This argument by the adoptive parents is disingenuous to say the least.

Moreover, I believe that the majority's interpretation is incorrect. "Adoption statutes are strictly construed in favor of the rights of the natural parents." 2 AM. JUR. 2D *Adoption* § 13 (1994). With respect to a proceeding regarding a nonconsenting parent, "every reasonable intendment is made in favor of that parent's claims." *Id.*

"When examining statutory language . . . we do not merely look at isolated phrases, but construe all parts of the statute together to effectuate its overall purpose and to avoid an absurd result." *DeVere v. Attorney General*, 146 N.H. 762, 768 (2001). "Although we will not look beyond the language of a statute to determine legislative intent if the statute's language is clear and unambiguous, where the statute's language is ambiguous or where more than one reasonable interpretation exists, we review legislative history to aid in our analysis." *Kaplan v. Booth Creek Ski Group*, 147 N.H. 202, 204-05 (2001) (quotations and citations omitted).

The threefold purpose of RSA chapter 170-B is to protect:

I. The adoptive child, from unnecessary separation from the child's natural parents and from adoption by parents who should not have such responsibility.

II. The natural parent or parents, from hurried and coerced decisions to give up the child.

III. The adoptive parent or parents and guaranteeing them an undisturbed relationship with the child from and after the date of adoption.

RSA 170-B:1 (Supp. 2001).

The majority interprets the phrase "prior to . . . the mother consenting to an adoption," which was added to RSA 170-B:5-a, I, in 1996, as governing the events that must occur before a putative father is entitled to notice. *See* N.H.H.R. JOUR. 467 (1996). In my view, the phrase governs *when*, not *whether*, an individual has a right to notice and a hearing on the question of paternity. Thus, a putative father who is named in an affidavit by the natural mother or who is known by the court, the prospective adoptive parents, or their attorney, must be given notice of the pending adoption proceedings before the natural mother consents and relinquishes the child.

This interpretation is supported by the legislative history. The phrase "prior to . . . the mother consenting to an adoption" was added pursuant to House Bill 1301 to make clear that notice must be given to the putative father before the biological mother consents to the adoption. As one of the sponsors of House Bill 1301 explained:

What happened is that the legislature over time added additional means by which the court could become aware of the fact that there was a man claiming paternity. . . . What happened, though, is that we were inconsistent in what the court had to do with that information. In some instances, we said that the court had to notify that man that he had a right to file for a paternity hearing before the mother relinquished right to her child, and in some instances, we said after the mother relinquished right to the child.

So we have been inconsistent. What this bill does, is makes it consistent that no matter how it comes to the attention to [*sic*] the court that there is a man who is claiming to be the father of the child who is being placed for adoption, that *man must be notified prior to the mother consenting to the adoption.*

HEARING ON H.B. 1301 BEFORE THE SENATE COMMITTEE ON JUDICIARY 3 (March 13, 1996) (emphasis added).

The purpose of the amendment was not to erode the father's parental rights, but to safeguard them, as the following colloquy demonstrates:

> Senator David K. Wheeler, D. 11: I'm not familiar with what paternal rights are under the kinds of situations now. Does the father have any legal power or anything like that? Currently?
>
> Representative Hallyburton: Yes. The father must consent to the adoption just as the mother must consent.
>
> Senator David K. Wheeler, D. 11: And nothing changes with this bill?
>
> Representative Hallyburton: Nothing changes with this bill.
>
> Senator David K. Wheeler, D. 11: Except for when if he's going to be noticed?
>
> Representative Hallyburton: Well, if the man is not married to the mother, and if he claims to be the father, and wishes to have a hearing on that matter, this is a matter of when he will be noticed of his right to file for that hearing.
>
> Senator David K. Wheeler, D. 11: To prove paternity?
>
> Representative Hallyburton: To prove paternity, that's correct.
>
> Senator George A. Lovejoy, D. 6: If the mother wishes to put the child up for adoption, and the father does not want to. Is there a pecking order?
>
> Representative Hallyburton: No, Senator, both parents must consent.
>
> Senator George A. Lovejoy, D. 6: If both parents do not consent. And the father wants the child. Does he get the child?
>
> Representative Hallyburton: Of course. He's the parent, yes.

*Id.* at 3-4.

As Representative Hallyburton later explained, as amended, RSA 170-B:5-a was not intended to "unilaterally disinvest [*sic*] the other parent of his paternal rights," but rather to permit the paternity proceeding to go forward before the adoption proceeding, by requiring the putative father to be notified before the child is surrendered. *Id.* at 4.

The objective of RSA 170-B:5-a, I, is thus to ensure that fathers entitled to notice and an opportunity to prove paternity receive those rights before the mother surrenders the child. RSA 170-B:5-a, I, sets forth the circumstances that entitle a father to notice and an opportunity to prove paternity. Under RSA 170-B:5-a, I(a)-(b), a father who is named by the mother or known by the prospective adoptive parents, their attorney or the court, is entitled to notice before the mother consents. Once notified, RSA 170-B:5-a, II requires him to request a paternity hearing within thirty days of notice. If he fails to request such a hearing, he forfeits all of his parental rights. RSA 170-B:5-a, II. If he timely requests a paternity hearing and is declared the father, then his consent to the adoption is required. RSA 170-B:5, I(d).

RSA 170-B:5-a, I, as amended, is thus part of a statutory scheme that is intended to ensure that all of the requisite consents are obtained *before* the child is surrendered. *See* RSA 170-B:12, II (Supp. 2001) (specifying that adoption petition must include "name of any person whose consent to the adoption is required but who has not consented" and providing that if requisite consents not obtained, petition must explain "the facts or circumstances which excuse the lack of such consent normally required to the adoption").

For instance, in the case of an in-state adoption, RSA 170-B:9, II(b) (Supp. 2001) requires that the parent's consent be executed "in the presence of the court or an authorized representative of the court in which the petition for adoption has been, or is to be, filed." RSA 170-B:9, II-a (Supp. 2001) further provides that a consent so executed "shall give the care, custody and control of the child to be adopted to the prospective adoptive parents of said child." Under this statutory scheme, the mother does not execute her consent and surrender the child until the parties are in court and the father has received notice and an opportunity to prove paternity. *See also* RSA 170-B:8, II (Supp. 2001) (relinquishments of parental rights also done in presence of and with approval of court or person designated by court).

Requiring notification to the putative father and, if he proves paternity, requiring his consent before the mother executes her consent, promotes finality and ensures that the biological father's rights will not be divested unilaterally. It also protects the child's interests. The child does not "languish in limbo," *Matter of Pima Cty. Juv. Severance Action*, 876 P.2d 1121, 1132 (Ariz. 1994), because the mother does not surrender the child until the father is notified of the prospective adoption and given the opportunity to prove paternity and consent to the adoption.

In this case, the biological father was not only named by the mother, but his identity was known by the prospective adoptive parents and their

attorney before the adoption proceeding was even filed. Under these circumstances, it would thwart legislative intent to curtail his right to prove paternity and consent to the adoption. *See In re Sky D.*, 138 N.H. 543, 547 (1994); *see also* HEARING ON H.B. 1301 BEFORE SENATE COMMITTEE ON JUDICIARY 7 (March 13, 1996) (one protection in H.B. 1301 for father who does not know that mother has given up child for adoption is requirement that if name of father is known, prospective adoptive parents must ensure that father is notified of proceeding).

The majority's interpretation of the relevant statutes leads to an anomalous result, particularly with respect to out-of-state adoptions, such as that at issue, where neither the natural mother nor putative father resides in New Hampshire. Under the majority's interpretation, the putative father is not entitled to notice even though he is named in the mother's affidavit, and thus known to the court and to the prospective adoptive parents and their attorney, merely because the mother's out-of-state consent was obtained before her affidavit was filed in court in New Hampshire. As a practical matter, under this interpretation, the only ways for the putative father to ensure that he is notified and given an opportunity to prove paternity are if he files with the putative father registry in *New Hampshire before* the mother consents to the adoption out-of-state, *see* RSA 170-B:5-a, I(c), or if he lives with and supports the child before the mother consents, *see* RSA 170-B:5-a, I(d). It is illogical to assume that a father residing out-of-state will file a paternity claim in New Hampshire before he knows that the biological mother intends to put the child up for adoption here. It is equally illogical to assume that a putative father would live openly with and support a child about whom he knows nothing.

The biological father's parental rights should not be terminated by this adoption, absent an adjudication that he is an unfit father. This father was entitled to notice of the proceedings and, pursuant to the prospective adoptive parents' own motion, was notified of them. Within thirty days thereof, he initiated paternity proceedings. Since that time, he has attended numerous hearings in New Hampshire, vigorously opposed this adoption, and stated his desire to raise his daughter himself. Under these circumstances, his interest in his daughter is more than merely biological and may be entitled to constitutional protection. *See Lehr v. Robertson*, 463 U.S. 248, 261-62 (1983) (parental rights of biological father who grasps opportunity to develop relationship with child and accept responsibility for her are constitutionally protected).

Nor should the biological father's parental rights be terminated by this adoption merely because the prospective adoptive parents claim to be better parents. New Hampshire law does not "authorize[] unrelated

persons to retain custody of a child whose natural parents have not been found to be unfit simply because they may be better able to provide for her future and her education." *Deboer v. Deboer*, 509 U.S. 1301, 1302 (1993) (Stevens, Circuit Justice). This court is "not free to take children from parents simply by deciding another home offers more advantages." *Id.* (quotation omitted).

NADEAU, J., joins in the concurrence and dissent.