NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

9th Circuit-Nashua Probate Division
No. 2019-0743


IN RE J.P.


Argued: June 10, 2020
Opinion Issued: July 31, 2020


McLane Middleton, Professional Association, of Manchester (Ralph F. Holmes and Jacqueline A. Leary on the brief, and Ms. Leary orally), for the petitioner.


Law Office of Joshua L. Gordon, of Concord (Joshua L. Gordon on the brief and orally), for the respondents.


DONOVAN, J. The respondents, the mother and stepfather of J.P., a minor child, appeal orders of the Probate Division of the Circuit Court (Quigley, J.): (1) vacating the stepfather's adoption of J.P. due to lack of notice of the adoption proceeding to the petitioner, J.P.'s biological father; and (2) awarding attorneys' fees and costs, including the cost of a genetic paternity test, to the petitioner. Because the record supports the trial court's determination that the petitioner was entitled to notice of the adoption proceeding under RSA 170-B:6, I(d) (2014), we affirm its decision to vacate the adoption. We also affirm its award of attorneys' fees and costs relating to the petition to vacate the adoption, but vacate and remand the award of attorneys' fees and costs relating to genetic testing.

## I. Facts

The trial court found, or the record supports, the following facts. In 2013, following a casual but intimate relationship with the petitioner, the mother became pregnant. That summer, the mother informed the petitioner of the pregnancy. In January 2014, the mother gave birth to J.P. While the mother reached out to the petitioner to request his medical history when J.P. was born, the mother and petitioner did not otherwise have contact for nearly two years. The mother did not identify anyone as J.P.'s father on his birth certificate; instead she gave the child her last name.

In April 2014, the mother sent a letter to the petitioner's parents, in which she informed them that J.P. was their grandson, invited them to be involved in his life, and stated that it was her desire to do "everything in [her] power to introduce him to both sides of his family." However, the petitioner and mother did not communicate until November 2015, when the petitioner contacted the mother because he wanted to be involved as a father to J.P. Because the mother was initially reluctant for the petitioner to meet J.P., she met with the petitioner before allowing him to visit J.P. for the first time in December 2015.

Between December 2015 and the summer of 2018, the petitioner visited with J.P. on a regular — often weekly — basis. Although the visits were subject to the mother's restrictions, the petitioner's responsibilities increased with time. The mother preferred that visits occur at her residence, where she and J.P. lived with her sister, and she declined the petitioner's requests to take J.P. overnight. Thus, the petitioner's visits usually took place at the mother's home, where the petitioner played with J.P., read to him, gave him baths, fed him, and put him to bed. Eventually, the mother allowed the petitioner to visit with J.P. at the petitioner's apartment and take J.P. to visit with the petitioner's family members, who accepted J.P. as family. The petitioner also attended J.P.'s birthday parties at the mother's residence.

During this period, the petitioner and the mother identified the petitioner to J.P. as his father. J.P. called him "Dada." The mother sent the petitioner Father's Day and Valentine's Day cards, which addressed the petitioner as "daddy" and were signed with J.P.'s name. The mother also sent cards and photographs of J.P. to the petitioner's parents, addressing them as "Grandma" and "Papa."

Shortly after the petitioner became involved in J.P.'s life, he also began providing the mother with regular financial support for J.P. Between January and August 2016, he provided approximately $300 to $400 each month by checks issued to the mother. Beginning in September, when J.P. started preschool, he increased the payments to approximately $800 per month. In

2

total, between January 2016 and December 2018, the petitioner gave the mother at least $25,250.

In October 2017, the mother and the petitioner completed and filed a Voluntary Acknowledgment of Paternity form with the Commonwealth of Massachusetts to allow the petitioner's name to be placed on J.P.'s birth certificate. The Commonwealth, however, returned the form to the mother due to several clerical errors, including a discrepancy in the spelling of the mother's name, and requested that she and the petitioner submit a corrected form. Neither parent made an effort to refile the form.

Around this time, the mother and stepfather became romantically involved. As time progressed, communication between the mother and the petitioner became increasingly strained, particularly with regard to the petitioner's plans with J.P. for the summer of 2018. The mother wanted the stepfather to be included in any communication she had with the petitioner, and the stepfather was present during an in-person meeting between the mother and the petitioner in June 2018 regarding the summer visitation schedule.

In August 2018, the mother and stepfather were married. Until early September, the petitioner continued to spend time with J.P. Thereafter, communication between the petitioner and the mother regarding visits "completely broke[] down." The petitioner, nevertheless, continued to send the mother checks each month, in amounts of up to $860. He also sent J.P. a Halloween gift in October and a Happy Thanksgiving message in November, and asked the mother to Facetime with J.P. on Christmas.

Meanwhile, unbeknownst to the petitioner, on October 8, the respondents signed an adoption petition for the stepfather to adopt J.P., and subsequently filed it with the probate division on November 8. On November 29, in connection with this petition, the mother filed an Affidavit of Birth Mother. In the affidavit, she attested that, "[t]o the best of [her] knowledge, no person holds himself out to be the father of [her] child." The mother and stepfather did not provide notice to the petitioner of the pending adoption petition or alert the court of his identity. On December 31, 2018, the Probate Division (Quigley, J.) held a hearing on the adoption petition at which only the mother, stepfather, J.P., and their counsel were present. The trial court granted the petition after the mother orally consented to the adoption. As the hearing came to a close, the stepfather asked the court, "If [J.P.'s] biological father were to ever attempt to show up, would that change anything for me?" The trial court, in response, asked whether there is an identified father. The respondents both answered "[n]o." The trial court then reviewed the file, and, noting that no father was identified in the affidavit, the birth certificate, or putative father registry, indicated that the adoption was final.

3

That same day, shortly after the hearing, the stepfather sent a text message to the petitioner, stating, "we are sending your checks from the last 3 months back to you. Do not send anything else to my family's home, and do not contact any of us moving forward." On January 3, 2019, the petitioner received three checks that he had previously provided to the mother in October, November, and December. The petitioner obtained counsel and subsequently learned that the stepfather had adopted J.P. As a result, the petitioner filed a petition to reopen and vacate the adoption for lack of notice.

In July, while the petition to reopen was pending, the petitioner filed a motion seeking an order for a genetic paternity test because the respondents would neither stipulate that the petitioner is J.P.'s biological father nor agree to a test. The trial court granted the motion over the respondents' objection.

In August, the trial court held an evidentiary hearing on the petitioner's motion to vacate the adoption, at which it heard testimony from the petitioner and respondents. Following the hearing, but before the trial court's ruling, the petitioner filed a motion to supplement the record with the results of the paternity test, which demonstrated a 99.9999% likelihood that the petitioner is J.P.'s biological father. The motion also requested that the respondents "pay all costs related to the genetic testing, . . . including the costs and attorneys' fees of filing" the motion. The respondents objected.

Thereafter, the trial court issued an order granting the petitioner's motion to vacate the adoption. It found that the petitioner was entitled to notice under RSA 170-B:6, I(d), because he provided financial support to the mother and J.P. and held himself out as J.P.'s father prior to the mother's consent to the adoption. The trial court further found that the mother filed her affidavit, after consultation with counsel, "with an intentional falsehood," and did so "knowing full well that [the petitioner] held himself as the father of [J.P.], had a relationship with the child and provided financial support for the child." The trial court also faulted the stepfather and the respondents' trial counsel for failing to correct the record as to the Affidavit of Birth Mother or alert the trial court as to the petitioner's existence, noting that, if they had, the petitioner would have been entitled to notice under RSA 170-B:6, I(b). Based on these determinations, the court concluded that the respondents "acted intentionally and in bad faith to deny the birth father his due process right to notice prior to the adoption," and granted the petitioner's request for attorneys' fees.

In a separate order, issued the same day, the trial court granted the petitioner's motion to supplement the record with the paternity test. In that order, the trial court determined that the petitioner had proven, by clear and convincing evidence, that he is J.P.'s biological father. The trial court again found that the respondents "intentionally misrepresented facts and acted in bad faith in their attempt to complete an adoption of [J.P.]" and awarded to the petitioner "the costs of genetic paternity testing and attorneys' fees for filing the

4

motion for paternity testing." The respondents moved for reconsideration of these decisions. The trial court denied the motions and this appeal followed.

## II. Analysis

### A. Decision to Vacate the Adoption

The respondents first challenge the trial court's decision to vacate the adoption, arguing that the trial court erred in concluding that the petitioner was entitled to notice. We review a decree of the probate division for errors of law, In re Baby Girl P., 147 N.H. 772, 774 (2002), and will not disturb it unless it is unsupported by the evidence or plainly erroneous as a matter of law, In re Adam R., 159 N.H. 788, 792 (2010). We will not disturb the probate division's factual findings "unless they are so plainly erroneous that such findings could not be reasonably made." RSA 567-A:4 (2019). "We defer to the trial court's judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence." In the Matter of Geraghty & Geraghty, 169 N.H. 404, 416 (2016) (quotation and brackets omitted). "The trial court may accept or reject, in whole or in part, the testimony of any witness or party, and is not required to believe even uncontroverted evidence." Id. (quotation omitted).

Adoption is a creature of statute, and, as such, requires strict observance of the statutory requirements. Baby Girl P., 147 N.H. at 775. Accordingly, we interpret the applicable statutes, applying our rules of statutory interpretation. See id. Statutory interpretation is a question of law, which we review de novo. In re J.W., 172 N.H. 332, 335 (2019). In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole. Id. We focus on the words of the statute because they are the touchstone of the legislature's intent. Id. We give effect to every word of a statute whenever possible and presume that the legislature did not enact superfluous or redundant words. Id. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id.

We turn first to the language of the relevant statutes. See RSA 170-B:2, :4-:6 (2014). RSA chapter 170-B (2014 & Supp. 2019) governs adoption proceedings, including adoptions by individuals married to a parent of the adoptee. See RSA 170-B:4, IV(a). However, as relevant here, before an adoption may be finalized, the statute requires that "a surrender of parental rights . . . be obtained from: . . . [t]he birth father, provided that he was found to be entitled to notice and found to be entitled to the right to surrender his parental rights under RSA 170-B:6." RSA 170-B:5, I(c); see also RSA 170-B:2, XVII (defining "surrender" as "the release of all parental rights, including but not limited to care, custody, and control of the child, by a parent").

5

RSA 170-B:6 requires, in relevant part, that notice of a pending adoption be given to "[a] person who is openly living with the child or the child's birth mother or providing financial support to her or the child at the time any action under this chapter is initiated and who is holding himself out to be the child's father." RSA 170-B:6, I(d). RSA 170-B:6 further provides that "[a]ny person entitled to notice . . . under paragraph I shall be provided 30 days from the date of the court's notice to request a hearing," at which he must prove "by a preponderance of the evidence that he is the legal or birth father of the child." RSA 170-B:6, II. RSA 170-B:6 requires that this section "be construed broadly in favor of providing an alleged father with notice by the court pursuant to paragraph I." RSA 170-B:6, III. Because the adoption of a child severs any parental rights of the child's biological father, see RSA 170-B:25 (2014); J.W., 172 N.H. at 343, the notice requirement and opportunity to prove paternity provided to certain fathers under RSA 170-B:6 serves to protect this constitutional right, see Adam R., 159 N.H. at 792; Baby Girl P., 147 N.H. at 784 (Dalianis, J., concurring in part and dissenting in part).

Here, the trial court concluded that the petitioner was entitled to notice under RSA 170-B:6, I(d) because he "was providing financial support and holding himself out as the father of [J.P.] for approximately three years prior to the mother consenting to the adoption" on December 31, 2018. The respondents argue, however, that the petitioner neither provided financial support nor held himself out as J.P.'s father. We address each argument and applicable statutory provision in turn.

1. "Financial Support" Provision

The respondents do not dispute the trial court's finding that the petitioner provided, and the mother accepted, the petitioner's payments between January 2016 and September 2018. Nor do they dispute the trial court's finding that the petitioner sent the mother checks during the months of October, November, and December 2018. The respondents argue, however, that the petitioner did not provide financial support at the time the respondents initiated the adoption proceeding, as required under RSA 170-B:6, I(d), because the October and November checks were mere offers that the mother "had rejected, by not depositing."

Accepting this argument would require that we ignore the relevant language of the statute and the undisputed facts in this case. RSA 170-B:6, I(d) entitles a person to notice of the adoption proceeding if he was "providing financial support to [the child's birth mother] or the child at the time any action under this chapter is initiated." (Emphasis added.) Here, the petitioner gave the mother checks dated October 1, November 2, and December 10, 2018, each in the amount of $860, consistent with the monthly payments he had been providing to the mother, and which she had accepted, for over two years. The respondents filed the adoption petition on November 8, 2018, less than a

week after the date of the petitioner's November payment, and approximately one month before his December payment. Accordingly, the evidence demonstrates that the petitioner was <u>providing</u> payments <u>to</u> the mother at the time the adoption proceeding was initiated. <u>See</u> RSA 170-B:6, I(d). The mother's decision not to deposit the two most recent checks provided by the petitioner shortly before she filed the adoption petition does not negate the fact that the petitioner provided the payments to her and that she could have deposited them at any time.

The respondents' reliance upon the decision of the North Carolina Supreme Court in <u>In re Adoption of Anderson</u>, 624 S.E.2d 626 (N.C. 2006), is misplaced. In <u>Anderson</u>, the court concluded that a biological father's unaccepted offers of financial support were insufficient to constitute "support" under the relevant North Carolina statute, which explicitly required "reasonable and consistent payment for the support of the biological mother." <u>Id</u>. at 629-30 (quotation and emphasis omitted). In that case, however, the father "never provided any actual financial payments" to the biological mother at any time, <u>id</u>. at 630 (quotations and brackets omitted). The facts here differ. The mother accepted every payment from the petitioner leading up to the adoption proceeding, and although she did not deposit the final three checks, she had them in her possession until the adoption was finalized. These distinctions render <u>Anderson</u> inapposite.

The respondents next argue that the petitioner's payments were "too late and inconsistent to qualify as 'financial support'" because he "offered nothing during [the] pregnancy and for two years after [J.P.'s] birth," and, when he did provide payments, the amounts and frequency fluctuated. We find this argument unavailing. To qualify for notice under the statute, an individual need not provide financial support during the pregnancy or at any specific point in the child's life; he must provide financial support "at the time any action under this chapter is initiated." RSA 170-B:6, I(d). As we have discussed, the record demonstrates that the petitioner provided financial support at that time. <u>See id</u>.[1]

Finally, the respondents contend that the petitioner's payments do not constitute "financial support" because the petitioner and mother "never discussed what the checks were for," and suggest that the petitioner may have had some unknown and potentially devious motive for providing such payments other than supporting the mother and J.P. This argument is meritless. The trial court found that the mother "understood that the money was for the care and support of [J.P.]" and that the mother and petitioner, by their actions, "implicitly agreed that he would provide financial support and she accepted it." The respondents provide no reason why these findings of fact

---

[1] Because the petitioner made payments contemporaneously with the filing of the adoption petition, we need not address the timing requirement any further.

7

"are so plainly erroneous that such findings could not be reasonably made." RSA 567-A:4. Further, although the mother testified that they never discussed, and she did not know, the purpose of the money, the trial court expressly found that this testimony was not credible. Because the trial court may accept or reject the testimony of any witness or party, it was not compelled to credit the mother's testimony. See Geraghty, 169 N.H. at 416.

### 2. "Holding Out" Provision

In addition to providing financial support, an individual must "hold[] himself out" as the child's father to be entitled to notice under RSA 170-B:6, I(d). Based upon the evidence demonstrating that the petitioner had a consistent and supportive father-son relationship with J.P. over the three-year period, the trial court concluded that he held himself out as J.P.'s father. The respondents argue, however, that the petitioner's behavior fell short of satisfying the "holding out" provision. They first contend that the petitioner did not hold himself out as J.P.'s father because, prior to the adoption proceeding, he failed to take one or more legal or administrative measures, including establishing paternity through a paternity action, placing his name in the putative father registry, successfully completing the necessary paperwork to have his name placed on J.P.'s birth certificate, initiating a parenting plan or child support proceeding, or obtaining a genetic test.

RSA chapter 170-B does not define the phrase "holding himself out," and we have yet to consider it in the context of this statute. However, in construing the phrase according to its "common and approved usage," Appeal of Town of Belmont, 172 N.H. 61, 65 (2019) (quotation omitted), holding oneself out is commonly understood as representing oneself to others as having a particular role or identity. See Webster's Third New International Dictionary 1079 (unbridged ed. 2002) (defining "hold out" as "to make out to be : represent"); see, e.g., RSA 329:24, I (2017) (making it unlawful to "hold oneself out" as a physician without state authorization); RSA 331-A:2, III(g) (2017) (defining "broker" as anyone who "[a]dvertises or holds oneself out as being engaged in the business" of buying and selling real estate); see also RSA 168-B:2, V(d) (Supp. 2019) (providing that, under the surrogacy statute, see RSA ch. 168-B (2014 & Supp. 2019), a person is presumed to be the parent of a child if, inter alia, the person "openly holds out the child as that person's child"); In re Guardianship of Madelyn B., 166 N.H. 453, 462-63 (2014) (concluding that the petitioner pleaded sufficient facts to prove that she was the presumed parent under the surrogacy statute where the facts showed that she, inter alia, appeared "to the world" as the child's parent).

Taking the legal or administrative steps identified by the respondents may constitute evidence that one is representing himself to others as the child's father. However, viewing the "holding out" provision in light of our presumption that the legislature does not enact superfluous or redundant

words, see J.W., 172 N.H. at 335, and the statute's command that we construe its provisions broadly in favor of providing an alleged father with notice, RSA 170-B:6, III, we conclude that the legislature did not intend for such actions to be necessary to fall within the "holding out" provision under RSA 170-B:6, I(d).

As an initial matter, to the extent that the respondents contend that an individual has not held himself out as the father unless he already petitioned the court to prove his paternity, the statute does not support this interpretation. RSA 170-B:6 provides notice to "an alleged father." RSA 170-B:6, III (emphasis added). RSA 170-B:6, I, sets forth four distinct categories of individuals who are entitled to notice — none of which requires that the individual have proven paternity. If an individual is entitled to notice under one of these categories, the statute provides him with the opportunity to prove his paternity before the adoption occurs. See RSA 170-B:6, II; Baby Girl P., 147 N.H. at 778 (explaining that the "statutory scheme protects a putative father's rights by giving him several avenues by which he can preserve his parental interests"). Thus, by providing an opportunity to prove paternity, the statute contemplates that the individual has not yet taken steps to do so. See RSA 170-B:6, II.

Moreover, we fail to see why the legislature would intend for the "holding out" provision to require an individual to have taken legal or administrative measures in light of the other, independent categories under RSA 170-B:6, I, that provide notice to individuals who do take legal or administrative action. For example, RSA 170-B:6, I(c) provides notice to an individual who has registered with the putative father registry. Similarly, RSA 170-B:6, I(b) provides notice, under certain circumstances, to an individual who is "[t]he birth or legal father." A person is a "birth father" or "legal father," as used in this statute, based upon certain legal or administrative measures that the individual or court has taken. See RSA 170-B:2, III (defining "birth father" as a person "who has been named, pursuant to RSA 170-B:6, as the father of the child, or who is the subject of a pending paternity action, or who has filed an unrevoked notice of intent to claim paternity of the child pursuant to RSA 170-B:6"), X (defining "legal father" as a person who is "designated as the father" on the child's birth certificate, by the court, or upon legitimation). Because RSA 170-B:6, I(b) and I(c) entitle individuals to notice based upon their involvement in specific legal and administrative measures, and in light of the common meaning of the phrase "holding himself out," we conclude that the legislature intended RSA 170-B:6, I(d) to apply to individuals who have not necessarily legally formalized their father-child relationships, but have nonetheless demonstrated their father-child relationships through their actions.

The respondents nevertheless argue that the petitioner's involvement in J.P.'s life was insufficient to demonstrate that he held himself out as J.P.'s father. They characterize the petitioner's role as that of a "babysitter" whose visits were "infrequent, brief, [and] irregular," and contend that he "did not

9

participate in day-to-day child rearing," such as feeding and bathing, and "dropped involvement" when "visitation became inconvenient." The respondents' assertions directly contradict the trial court's findings, which the evidence in the record amply supports.

Specifically, the evidence in the record, and inferences drawn therefrom, demonstrate that: at all times, the petitioner accepted and acknowledged that he was J.P.'s biological father; in November 2015, the petitioner sought to become involved in J.P.'s life as his father; for nearly three years leading up to the adoption, the petitioner spent time with J.P. as his father at the mother's apartment, where her sister also lived; the petitioner identified himself to J.P. as his father and J.P. called him "Dada"; the petitioner acted as J.P.'s father by reading to him, taking him to the playground, feeding and bathing him, and putting him to bed; the petitioner introduced J.P. to his family members, who accepted J.P. as family and maintained a familial relationship with him; the petitioner attended and helped with J.P.'s birthday parties at the mother's residence, and represented himself to the stepfather and the mother's family members as J.P.'s father; and he sought to increase his responsibilities and time with J.P. as his relationship with J.P. progressed. This evidence supports the trial court's determination that the petitioner held himself out as J.P.'s father.

The respondents contrast the involvement of the petitioner with that of the petitioner in Madelyn B., who, we concluded, "adequately pleaded that she received [the child] into her home and openly held [the child] out" as her own under the surrogacy statute in effect at the time. Madelyn B., 166 N.H. at 462; see RSA 168-B:3, I(d) (2014) (repealed 2014). Specifically, the respondents point to the Madelyn B. petitioner's "daily involvement in every aspect of the child's life" and her continued involvement — which included scheduled overnight and weekend visits — after the petitioner and the child's biological mother, with whom she was in a relationship, separated. See Madelyn B., 166 N.H. at 455-56.

We first note that, under the statute at issue in Madelyn B., a person was presumed to be the parent of a child if the person openly held the child out as his or her own and received the child into his or her home. See id. at 458. RSA 170-B:6, I(d) does not require an individual to receive the child into his home to be entitled to notice of an adoption. Moreover, nothing in Madelyn B. requires an individual to have daily involvement or overnight visits to meet the "holding out" provision of the statute. See id. at 462-63. In fact, in Madelyn B., we did not specifically rely upon the petitioner's day-to-day involvement in reaching our conclusion that the parent received the child into her home and openly held the child out as her own. See id. Thus, our decision in Madelyn B. did not preclude the trial court from finding that the petitioner held himself out as J.P.'s father despite his lack of daily involvement or overnight visits.

10

Finally, the respondents contend that the "holding out" provision requires "prompt attention to parenthood." They argue that, because the petitioner did not become involved in J.P.'s life until he was nearly two years old, the petitioner did not meet the "holding out" provision of the statute. To be entitled to notice of an adoption, RSA 170-B:6, I(d) does not require an individual to hold himself out at the time of the pregnancy or at the child's birth. Although the respondents rely upon the California Supreme Court's decision in Adoption of Michael H., 898 P.2d 891 (Cal. 1995), to support this proposition, that case did not involve a statutory "holding out" provision; it involved the question of whether an unwed father had a federal constitutional right to withhold consent to an at-birth, third-party adoption. Michael H., 898 P.2d at 901. Thus, this case is not relevant to our analysis.

Because we uphold the trial court's determination that the petitioner was entitled to notice under RSA 170-B:6, I(d), we need not address the respondents' arguments pertaining to the other categories of individuals entitled to notice under the statute.

## B. Award of Attorneys' Fees and Costs

The respondents next challenge the trial court's award of attorneys' fees and costs. They argue that the trial court erred in awarding attorneys' fees and costs for litigation relating to the petition to vacate the adoption because the meaning of the "holding out" provision presented a novel question of law, and, therefore, the mother was truthful when she attested that she knew of no one who held himself out as J.P.'s father. They further argue that the trial court erred in awarding attorneys' fees and costs for the litigation relating to the genetic testing.

The general rule in New Hampshire is that parties pay their own attorneys' fees. Fat Bullies Farm, LLC v. Devenport, 170 N.H. 17, 29 (2017). We have, however, recognized exceptions to this rule. Id. A prevailing party may be awarded attorneys' fees when that recovery is authorized by statute, an agreement between the parties, or an established judicial exception to the general rule that precludes recovery of such fees. Jesurum v. WBTSCC Ltd. P'ship, 169 N.H. 469, 482 (2016). One judicially-crafted exception is the bad faith litigation theory. See Fat Bullies, 170 N.H. at 30. Under this theory, an award of attorneys' fees is appropriate when one party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, when the litigant's conduct can be characterized as unreasonably obdurate or obstinate, and when it should have been unnecessary for the successful party to have brought the action. Id. When attorneys' fees are awarded against a private party who has acted in bad faith, the purpose is to do justice and vindicate rights, as well as to discourage frivolous lawsuits. Id.

11

We will not overturn a trial court's decision concerning attorneys' fees absent an unsustainable exercise of discretion.  Id.  To warrant reversal, the discretion must have been exercised for reasons clearly untenable, or to an extent clearly unreasonable, to the prejudice of the objecting party.  Id.  In evaluating the trial court's ruling on this issue, we acknowledge the deference given to a trial court's decision regarding attorneys' fees.  Id.  If there is some support in the record for the trial court's determination, we will uphold it.  Id.

We begin with the trial court's decision to award attorneys' fees for the litigation stemming from the petition to vacate the adoption.  The trial court concluded that the mother and the stepfather acted in bad faith by engaging in an intentional, concerted effort to conceal the identity of the petitioner from the court for the purpose of depriving him of notice of the proceeding.  This conclusion was based upon the trial court's findings that: (1) the mother "knowingly misstated material issues of fact" in her affidavit and during the adoption hearing — including her statement that she knew of no one who held himself out as the father — which prevented the petitioner from receiving notice, despite years of acknowledging the petitioner as J.P.'s father and accepting his involvement and financial support; and (2) the stepfather failed to notify the court about the petitioner, despite his knowledge of him as J.P.'s father.  The trial court also faulted the respondents' trial counsel for failing to notify the court or correct the record.

The respondents do not argue that these findings are unsupported by the record.  In fact, the respondents' argument does not even mention the trial court's findings regarding the stepfather's role, even though the trial court awarded the petitioner attorneys' fees against both respondents.  Rather, the respondents contend that, because we had not yet addressed the scope of the "holding out" provision, the mother believed that "a man holding himself out as a father would act with far more diligence than [the petitioner]," and, accordingly, "truthfully swore that no man held himself out as the father."

This argument is unavailing because the mother did not simply attest that she did not know of anyone who held himself out as the father during the adoption proceeding.  At the hearing, in response to the stepfather's question of whether the adoption could be jeopardized if J.P.'s biological father came forward, the trial court expressly asked the respondents if there was an "identified father."  (Emphasis added.)  The mother and stepfather responded in the negative.  Taking into consideration this representation, the evidence of the mother's acknowledgment of the petitioner as J.P.'s father since the pregnancy, her knowledge and acceptance of the petitioner's involvement in J.P.'s life as his father for nearly three years, and the respondents' initiation of the adoption proceedings without any notice to the petitioner, who was still providing financial support and attempting to maintain contact with J.P., it was neither clearly untenable nor unreasonable for the court to conclude that the mother made material misstatements during the adoption proceeding for the purpose

12

of concealing the petitioner's identity from the court — not simply because she misunderstood the meaning of the phrase "holding himself out." "[T]he trial court is in the best position to decide whether a party's claim constitutes bad faith or is patently unreasonable," and, given the support in the record for the trial court's conclusion, we will not second guess it. Emerson v. Town of Stratford, 139 N.H. 629, 632 (1995) (quotation omitted).

We now address the trial court's award of attorneys' fees and costs associated with the genetic testing. The trial court awarded these fees and costs because the respondents "intentionally misrepresented facts and acted in bad faith in their attempt to complete an adoption of [J.P.]." The respondents argue that the trial court erred because the petitioner "would have had to prove paternity" regardless of what occurred in the adoption proceeding.

The trial court did not award fees relating to the genetic testing based upon a finding that the respondents acted in bad faith by contesting his paternity or by opposing his motion for genetic testing. Nor did the trial court award fees on the basis that the respondents acted in bad faith by initiating the adoption action altogether. Rather, it found that the respondents made material misrepresentations and acted in bad faith "in their attempt to complete" the adoption, which, as identified in the trial court's order vacating the adoption, was their intentional failure to identify the petitioner to the court for the purpose of depriving him of notice.

The trial court's finding provides a reasonable basis for awarding the petitioner attorneys' fees and costs for his petition to vacate the adoption because, due to the respondents' bad faith, the petitioner was forced to pursue litigation to enforce his rights to notice and the opportunity to prove paternity. However, it does not provide a basis for the award of attorneys' fees and costs for the motion for genetic testing or for the genetic test itself, because, had the petitioner properly received notice, he would have had the burden of proving paternity by a preponderance of the evidence. See RSA 170-B:6, II. Although there may be a proper legal basis to award attorneys' fees and costs for the respondents' refusal to stipulate to paternity or their opposition to genetic testing, this determination must be made by the trial court in the first instance. Accordingly, we conclude that the award of fees and costs relating to the genetic testing, on the basis articulated by the trial court, was an unsustainable exercise of discretion. We, therefore, vacate the award and remand for the trial court to determine whether there exists a proper basis to award fees and costs in light of this opinion.[2]

---

[2] The respondents' notice of appeal raises the issue of whether the trial court erred in admitting and considering the results of the genetic test. The respondents' brief states, in a footnote, that, "[b]ecause biology is irrelevant, the court erred by accepting and considering the results of genetic testing." This sentence is inadequate to sufficiently brief this issue. See Halifax-American Energy Co. v. Provider Power, LLC, 170 N.H. 569, 574 (2018) ("[W]e confine our review to only those issues that the [appellant] has fully briefed."). Nevertheless, we note that the trial court did not

Because the record supports the trial court's finding that the petitioner was entitled to notice of the adoption proceeding under RSA 170-B:6, I(d), we affirm the trial court's decision to vacate the adoption.  Furthermore, we affirm the trial court's award of attorneys' fees and costs relating to the petition to vacate the adoption.  However, we vacate and remand the trial court's award of attorneys' fees and costs relating to the genetic testing.

Any issues that the respondents raised in their notice of appeal, but did not brief, are deemed waived.  See In the Matter of Patient & Patient, 170 N.H. 252, 255 (2017).

> Affirmed in part; vacated in part; and remanded.

HICKS, BASSETT, and HANTZ MARCONI, JJ., concurred.

---

base its determination that the petitioner was entitled to notice on the results of the biological test.  Rather, it considered the results of the genetic test in its determination that the petitioner had proven that he was J.P.'s father, which the respondents do not appeal.  See RSA 170-B:6, II.